**Charles B. RILEY, Plaintiff,**

v.

**The BENDIX CORPORATION, Defendant.**

**Civ. No. 69–118.**

United States District Court, M. D. Florida, Orlando Division.

July 7, 1971.

584

William Kreuter, Orlando, Fla., for plaintiff.

Norman Burke, of Ven den Berg, Gay, Burke & Dyer, Orlando, Fla., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

DUNCAN, Senior District Judge.

Plaintiff instituted this action in this court on June 3, 1969, pursuant to Title 42 Section 2000e–5 United States Code, the Civil Rights Act of 1964, alleging that the defendant had violated his civil rights by terminating his employment for the reason that he refused to work from sun-down on Friday until sun-down on Saturday of each week. He seeks damages, restoration to his former employment, an injunction enjoining the defendant from further interfering with his religious beliefs, and attorney's fees.

Plaintiff is a member of the Seventh Day Adventist Church and he states that one of the doctrines of his church is that its members shall not engage in any gainful employment between sun-down Friday and sun-down Saturday of each week.

Plaintiff was employed by the defendant in January, 1967, as a mechanical foreman at a salary of $725.00 per month. After serving a short period of time in the mechanical department, at his request he was placed in charge of a program for the training of mechanics. His hours were from 7:30 o'clock a. m. until 4:00 o'clock p. m. five days a week.

On July 14, 1967, the plaintiff was informed that he had been transferred to the second shift. The hours of labor on that shift were from 3:30 p. m. to 12:00 o'clock midnight, five days a week, which would require the plaintiff, in the performance of his duties, to work several hours after sun-down on Friday.

Plaintiff says that at the time of the transfer he told his general foreman, Mr. O'Neill, that he was a Seventh Day Adventist, and that his religious beliefs prevented him from working after sundown on each Friday. On the contrary, the supervisor says that the plaintiff did not object to the shift or tell him of his religious convictions at the time, but that just before going to work on the second shift plaintiff did come to his office and tell him that he could not work after sun-down on Fridays. Plaintiff also says that O'Neill told him under the company policy he would have to work the hours required on that shift.

At the time the Bendix Corporation was operating under a contract with the National Aeronautics and Space Administration in connection with the building and launching of missiles from Cape Kennedy. The particular branch of the section to which the plaintiff was assigned was engaged primarily in the maintenance of heavy machinery and other equipment incident to the launching of missiles. There were four groups

in the mechanical section to which the plaintiff was assigned, and at the time of his employment the section consisted of about 220 men. He was transferred from the mechanical group preparing training programs for the swing-arm program to the maintenance group and subsequently to the second shift. Plaintiff began work on the second shift on Monday, July 17, 1967.

After his assignment to the second shift, plaintiff did not work after sundown on any Friday. He would report for work at 3:30 and before sun-down he would notify his supervisor and leave the job. This meant that he had worked approximately three or four hours, and would be absent for the remainder of the second shift. He did not provide for any replacement during the period of his absence. He and his supervisor discussed the subject on several occasions, and on each occasion he was told that it would be necessary for him to continue his work.

It was the policy of the company to shift the foremen of a group every 90 days, which, of course, necessitated those who were assigned to the second shift to work from 3:30 to midnight, five days a week. The reassignment of plaintiff made in July, 1967, was necessitated by the vacation season. When one foreman was on vacation it was necessary for another foreman to substitute for him and to take his place.

On August 18, 1967, the plaintiff was discharged for insubordination for his refusal to work the required hours on the second shift. The controversy was submitted to the Equal Employment Opportunity Commission, and when the Commission and the Company were unable to agree upon a reinstatement of the plaintiff, this action was filed. The following written communications were passed between the plaintiff and various officers of the defendant prior to the filing of this suit:

On July 27, 1967, following plaintiff's transfer to the second shift, he signed an AVO (Avoid Verbal Orders) form, addressed to A. S. O'Neill in which he stated:

"Being a Member of the Seventh Day Adventist Church for the Past 13 Years I Observe the Seventh Day Sabbath from Friday at Sundown to Sat. at Sundown. I Would Like to Have this Time Off to Attend to My Religious Beliefs.

(I Will Work This Time in an Emergency)

From: Charles B. Riley".

On August 1, A/S. O'Neill signed an AVO addressed to Charles B. Riley, in which he stated:

"Time Off for the Seventh Day Church Observance

Any Employee is Allowed Time Off to Attend Church However Time Off for a Religious Observance Cannot be Allowed if Work Schedules Dictate a Necessity to Work.

The Above Does Not Pertain to Your Request to be Absent from Work Every Friday Evening at Sundown to Saturday Evening at Sundown. Your Request for Permission to do the Above was Turned Down By Me, and You Absented Yourself From the Job Irregardless.

From: A. S. O'Neill".

On August 3, 1967, the plaintiff signed another AVO directed to A. S. O'Neill, in which he stated:

"I Believe in Keeping the Sabbath Day Holy, for this Reason I Would Like to be Excused From Sundown Fri. to Sundown Sat. Time Off Will be Only 4 Hours by Regular Scheduled Shift."

Signed: "Charles B. Riley".

On August 4, A. S. O'Neill signed an AVO addressed to the plaintiff in which it was stated:

"Your Request to be Absent From the Job From 9 August 1967 through 11 August 1967 has been Granted, But Only as a Non-paid Absence."

Signed: A. S. O'Neill".

On the same day, August 4, A. S. O'Neill signed another AVO directed to Charles B. Riley, in which he stated:

"Your Required Hours of Work are From 1530 to 2400 Hours.

On August 7, A. S. O'Neill addressed a communication to Riley, in which he stated:

"Shift Requirements

You are required to be present daily for your entire scheduled shift, first or second shift, whichever it may be. You are also required to respond to the requests for overtime, first or second shift, whichever it may be. The Company has no allowance for Church Holidays as such, except for an occasional special service.

In the event the above is unacceptable to you, you should seek employment elsewhere. Your recent practice of working half of your scheduled shift on Fridays and clocking out without permission cannot be tolerated and if you continue to persist with this practice, you will be terminated."

On August 21, A. S. O'Neill signed an AVO addressed to Charles B. Riley in which it was stated:

"Termination

You have been terminated from the Bendix Launch Support Division effective 2030 Hrs 18 August 1967, for insubordination. You have been insubordinate on at least four occasions by absenting yourself from the job and going home prior to the end of your shift after you had been informed by me, verbally and in writing that your request to leave early had been denied."

Following the plaintiff's dismissal, the controversy was submitted to the Equal Employment Opportunity Commission. After consideration by that Commission, the Company addressed the following communication to Riley:

"Mr. Charles B. Riley
    10209 West Hillsborough Avenue
Tampa, Florida 33615

                              3 January 1968

Serial: IR–1 68–1

Dear Mr. Riley:

We have again reviewed the circumstances and conditions of your previous employment with the Launch Support Division at the request of the Office of Federal Contract Compliance with whom your complaint charging the division with religious discrimination was filed.

In keeping with sound management procedure, the division must accept its responsibility to point out the following:

(1) You were clearly in violation of established division policy through insubordination by leaving your job prior to the end of the shift on several occasions particularly after being told in writing not to do so.

(2) You acted without apparent regard for the continuation and safety of the operations of the Launch Support Division to maintain its contractual obligations with NASA since you left without notice or making preparation for someone to assume your responsibilities as foreman.

Under these circumstances the division felt compelled to take action to safeguard the integrity of its other employees. We believe your charges of religious discrimination to be without foundation.

Nevertheless, to make every possible effort to utilize your talents, we make the following offer subject to the condition (applicable to all employees in the division) that you agree to work as assigned and abide by divisional policy.

We hereby offer you reemployment as a foreman at the rate of $725. per month. We trust this arrangement

will be suitable to you and that your reemployment will be mutually beneficial to you and the division.

May we hear from you regarding your decision. It is necessary that we receive your answer by 12 January 1968, as we are holding the position open for you.

> Very truly yours,
>
> /s/ George W. Knox
> George W. Knox
> Supervisor, Employment and Employee Relations
> GWK/kk
>
> Ph: 305 267-4310"

On January 8, 1968, the plaintiff replied to the defendant's communication of January 3 in five paragraphs in which he sought to justify his leaving the job prior to sundown Friday. He then set out in detail the expenses which he had incurred in attempting to obtain other employment, in the amount of $4,520.00. He further stated:

> "I accepted an 'Industrial Engineering' position as an estimator working on Government contracts. The position is with the 'Honeywell Co., Tampa, Fla.
>
> I received a good salary and they hired me with the understanding I would have the 'Sabbath' from sundown Friday evening to sundown, Saturday evening off. I would like to point out that I'm now working 10-12 hours a day with a crash program coming up. I will come in on Sundays too. My talents will be used more here than at the 'Cape.'
>
> I will drop the charge against the Bendix Launch Support Division under the following conditions:
>
> Pay all losses of salary and expenses (Total—$4,520.00), permit me to be *re-instated* and let the records show that I resigned not 'Fired.'
>
> This letter indicates my wish to have a fair and final settlement of claim against the Bendix Launch Support Division.

> Respectfully,
>
> /s/ Charles B. Riley
> Charles B. Riley"

The defendant replied on January 25, 1968 as follows:

> "Mr. Charles B. Riley
> 10209 W. Hillsborough Avenue
> Tampa, Florida 33615
>
> 25 January 1968
>
> Serial: IR-1 68-14
>
> Dear Mr. Riley:
>
> We have your reply dated 8 January 1968 to our offer of reemployment. While you were unable to accept our offer, we are nonetheless pleased to learn that you are employed in a position satisfactory to you.
>
> Obviously we cannot assume responsibility for any of the various claims listed in your letter since these were incurred by you in pursuit of your personal objectives.
>
> Reinstatement is possible only upon agreement at the time of rehire whenever an employee has been terminated (voluntarily or involuntarily). Our records have been adjusted, however, to indicate that you are eligible for rehire as you requested.
>
> Our offer of reemployment was tendered in a positive effort to rehire you as the most appropriate avenue open to both you and the division for satisfying previous differences. As you are unable to accept our offer we must consider the matter closed.
>
> Very truly yours,
>
> /s/ George W. Knox
> George W. Knox
> Supervisor, Employment and Employee Relations
> GWK/kk"

Following the foregoing series of correspondence, this suit was filed. The parties have stipulated that by this action "the Plaintiff seeks reinstatement to his former job with the defendant before his discharge, back pay for loss of interim earnings between the date of discharge and the present date, attorneys

fees and court costs for the institution and prosecution of this lawsuit."

The defendant contends that it did not intentionally discharge the plaintiff because of his religious beliefs contrary to Section 706(a) of the Civil Rights Act of 1964, but rather for the reason that plaintiff was insubordinate in refusing to accept his shift assignment under the circumstances of this case, together with his failure to perform his duties as a foreman in the position to which he was assigned.

The parties have stipulated, and the court is in agreement, that the initial question which must be resolved is "did the defendant discharge the plaintiff in violation of Section 706 of the Civil Rights Act of 1964?"

The defendant contends that it was not its intention to violate the statute, nor did it discharge the plaintiff because of his religious belief, but solely because of his failure to follow rules of the company in failing to work the hours assigned to him.

Section 2000e–2 Title 42 U.S.C. provides:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin  *  *  *."

Under Section 713(a) of the Civil Rights Act of 1964, the Equal Employment Opportunity Commission is clothed with authority from time to time to issue, amend or rescind procedural regulations to carry out the provisions of the Act. Such regulations must be in conformity with the standards and limitations of the Administrative Procedure Act, Title 5 § 500 et seq. U.S.C. In accordance with such provision the Commission issued and published two sets of "Religious Discrimination Guidelines"

one effective on June 15, 1966, and the other effective July 10, 1967, which are set out in their entirety in appendices A and B, which are made a part hereof. These guidelines were in effect at the time of the plaintiff's transfer to the second shift, and at the time of his discharge.

■ The plaintiff relies heavily upon the regulations promulgated by the Equal Employment Opportunity Commission, and he cites numerous cases to the effect that the regulations issued by an agency charged with the administration of a statute should be given great weight by the courts in their interpretation of that statute.  Udall v. Tallman, et al., 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).  We do not disagree with that generally recognized principle of law. Such regulations to be valid must however, be in conformity with the Act which authorizes their issuance and with the standards and limitations set forth in the Administrative Procedure Act, Title 5 § 500 et seq. 42 U.S.C. § 2000e–12.

■ Paragraph (c) of the Commission's July 10, 1967, guidelines states:

"Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, *the employer has the burden of proving* that undue hardship renders the required accommodation to the religious needs of the employee unreasonable."  [Emphasis supplied]

We do not believe that the Commission is vested with the authority of determining the procedural question of burden of proof.  All hearings and investigations are to be conducted in accordance with the Administrative Procedure Act, and certainly the Commission has no right to say to this court that it shall shift the burden of proof from the plaintiff to the defendant.  Aside from that fact we feel it would be unreasonable and impractical to require the complex American business structure to prove

why it cannot gear itself to the "varied religious practices of the American people". See Appendix B paragraph (d).

In both the June 15, 1966 and the July 10, 1967, guidelines, the Commission expresses its view that it is the duty of employers not to discriminate on religious grounds and that employers should accommodate the reasonable religious needs of employees where such accommodation can be made without serious inconvenience to the conduct of the business. We note that the Commission in the issuance of the July 10, 1967 guidelines, did not expressly repeal paragraph (a) (3) of its June 15, 1966 guidelines which states that under Title VII of the 1964 Civil Rights Act an employer is free "to establish a normal work week * * * generally applicable to all employees," notwithstanding that such a schedule "may not operate with uniformity in its effect upon the religious observances of his employees."

In his brief the plaintiff cites the case of Jackson v. Veri Fresh Poultry, Inc., 304 F.Supp. 1276 (E.D.La.1969). The plaintiff in that action was employed by the defendant as a chicken picker at a wage of $1.25 per hour. She began work on August 9, 1966, and in November, 1966 she informed her foreman that she would be unable to work between approximately 5:00 p. m. Friday and 5:00 p. m. Saturday because in her religion that was considered the Sabbath. She was subsequently told by another of her supervisors that if she could not work after 5:00 p. m. or on Saturdays, the company could not use her services. The plaintiff's employment was terminated on November 16, 1966. The court determined that the plaintiff's discharge was in violation of 42 U.S.C. § 2000e.

In arriving at its conclusion the court was "impressed by the opinion * * * in the case of Dewey v. Reynolds Metals Co., [D.C.] 300 F.Supp. 709" which the court described as a "case strikingly similar" to the case then under consideration. The Dewey case was subsequently reversed in Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970),

S.Ct. 2186, 29 L.Ed.2d 269 affirmed 402 U.S. 689, 91.

We agree that the facts in Dewey and Jackson are substantially similar, but we have difficulty in following the reasoning of the court in arriving at the conclusion that the plaintiff in Jackson was discharged because of her religious beliefs. In our view her religion was simply an incident, and if it prevented her from performing the duties required of her by her employer, he had a right to separate her from the job. The rules of Bendix requiring work on Saturday applied uniformly to all employees no matter what their religious affiliation happened to be.

The plaintiff also cites Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In that case the plaintiff was a Seventh Day Adventist whose religious convictions prevented her from working on Saturday. She was denied unemployment compensation under the South Carolina Compensation Act for failing, without good cause, to accept available suitable work when it was offered to her. The Supreme Court held that it was a violation of her constitutional rights to refuse her workmen's compensation for failing to work on her Sabbath. We think the Sherbert case is clearly distinguishable from the case now before us and from the Jackson case.

The defendant denies that plaintiff was discharged because of his religious beliefs or that it had any intention to violate the statute in discharging the plaintiff. We believe that the defendant had a right to make rules and working conditions to be imposed upon its employees for the conduct of its business, if such rules are not in conflict with the law, and any one accepting employment is bound to accept such rules and working conditions.

Defendant's testimony clearly reveals that its rules and working conditions applied uniformly with respect to all of its employees and at no time did it ever discriminate against any person because

of race, creed or color. The record contains no evidence to the contrary.

■ The guarantee of religious freedom in the United States has resulted in many forms of religion, religious philosophies and sects, and it is the absolute right of every person that these beliefs shall not be infringed upon. An employer may not refuse to employ or discharge any person because of his religious beliefs, but surely the great and diversified types of American business cannot be expected to accede to the wishes of every doctrine or religious belief. If one accepts a position knowing that it may in some way impinge upon his religious beliefs, he must conform to the working conditions of his employer or seek other employment.

■ When plaintiff accepted employment with the defendant, he signed a compensation agreement which provided for compensation for "overtime or night shift work." He was a salaried employee and his pay was not based upon an hourly rate. If he was an essential employee it is not difficult to understand how leaving his job in the middle of the shift would have its effect upon the work he was performing.

As we have heretofore stated, the second shift was from 3:30 in the afternoon to midnight. After plaintiff's assignment to the second shift he reported for work at 3:30 but quit about 7:30 Eastern daylight saving time. Certainly to call another foreman to report for duty at 7:30 for the purpose of working until 12:00 in the evening, would not only be impractical but likely impossible under existing labor agreements.

Although the plaintiff contends that Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970), is to be distinguished both factually and legally from the case now before us, we must respectfully disagree. Dewey, because of his religious beliefs, refused to perform overtime labor when, under the rules of his company, he was required to do so. He was discharged because of his refusal to work on Sunday. At the time of his discharge there was a contract in force between the labor organization to which Dewey belonged and Reynolds. This agreement provided:

"All employees shall be obligated to perform all straight time and overtime work required of them by the Company except when an employee has a substantial and justifiable reason for not working  *  *  *."

Following his discharge Dewey filed grievances which were subsequently submitted to arbitration. The arbitrator ruled adversely to Dewey holding it was his duty to perform the work required. After obtaining a like ruling from the Michigan Civil Rights Commission Dewey filed a charge with the Equal Employment Opportunity Commission alleging religious discrimination. The Commission then authorized the bringing of suit under Title VII of the Civil Rights Act of 1964. The Court of Appeals for the Sixth Circuit found nothing discriminatory in the provision of the collective bargaining contract or in the manner in which Reynolds executed it. The court stated at page 330:

"The reason for Dewey's discharge was not discrimination on account of his religion; it was because he violated the provisions of the collective bargaining agreement entered into by his union with his employer, which provisions were applicable equally to all employees. The violation consisted not only of his refusing to work on Sundays, but also his refusing to arrange for a replacement, which was an alternate procedure."

We are unable to draw a distinction between the *Dewey* case and the present case, so far as the legal principles involved are concerned, because the Union contract required a member to work overtime or on Sunday, if necessary. Certainly if it is a violation of an employee's constitutional rights for the employer to require him to work overtime or to work on Sunday, it would equally be a violation of his constitutional rights for his union to attempt to enforce such a contract agreement.

The most recent expression on the subject is found in Dawson v. Mizell, 325 F.Supp. 511 (E.D.Va.1971). Dawson was a mail carrier and a Seventh Day Adventist. He was discharged by the postmaster for failure to work on Saturday. Dawson did not have enough seniority to obtain a position which did not require Saturday work, and his assignment to another shift would have been a violation of the bargaining contract between the Post Office Department and the Union. Because of his lack of seniority, Dawson found himself assigned to a shift which required that he work on Saturday. Judge Merhige held that:

> "The Court finds no infringement of plaintiff's rights concerning his religious beliefs. Religious discrimination should not be equated with failure to accommodate."

The testimony reveals that it was the policy of the defendant to rotate its foremen on the second shift every 90 days, and in the regular course of carrying out this practice plaintiff was assigned to that shift on July 17, 1967. This was the vacation season and when a foreman was on vacation, it became necessary for some other foreman to take his place.

It is our finding that the defendant did not in any respect discriminate against the plaintiff because of his religious beliefs. The assignment to the second shift came in the usual and normal conduct of the defendant's business and was in no respect discriminatory against any foreman because of his religion. All of the foremen were treated equally.

It is therefore our conclusion that the plaintiff was discharged solely because of his refusal to work the hours assigned to him and not as a result of any religious discrimination against him on the part of the defendant.

## APPENDIX A

### Equal Employment Opportunity Commission

### RELIGIOUS DISCRIMINATION GUIDELINES

#### (Effective June 15, 1966)

"Section 1605.1 Observance of Sabbath and religious holidays.—(a) (1) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or to refuse to hire a person whose religious observances require that he take time off during the employer's regular work week. These complaints arise in a variety of contexts, but typically involve employees who regularly observe Saturdays as the Sabbath or who observe certain special holidays during the year.

"(2) The Commission believes that the duty not to discriminate on religious grounds includes an obligation on the part of the employer to accommodate the reasonable religious needs of employees and, in some cases, prospective employees where such accommodation can be made without serious inconvenience to the conduct of the business.

"(3) However, the Commission believes that an employer is free under Title VII to establish a normal work week (including paid holidays) generally applicable to all employees, notwithstanding that this schedule may not operate with uniformity in its effect upon the religious observances of his employees. For example, an employer who is closed for business on Sunday does not discriminate merely because he requires that all his employees be available for work on Saturday.

"Likewise, an employer who closes his business on Christmas or Good Friday is not thereby obligated to give time off

with pay to Jewish employees for Rosh Hashanah or Yom Kippur:

"(b) While the question of what accommodation by the employer may reasonably be required must be decided on the peculiar facts of each case, the following guidelines may prove helpful.

"(1) An employer may permit absences from work on religious holidays, with or without pay, but must treat all religions with substantial uniformity in this respect. However, the closing of a business on one religious holiday creates no obligation to permit time off from work on another.

"(2) An employer, to the extent he can do so without serious inconvenience to the conduct of his business, should make a reasonable accommodation to the needs of his employees and applicants for employment in connection with special religious holiday observances.

"(3) The employer may prescribe the normal work week and foreseeable overtime requirements, and, absent an intent on the part of the employer to discriminate on religious grounds, a job applicant or employee who accepted the job knowing or having reason to believe that such requirements would conflict with his religious obligations is not entitled to demand any alterations in such requirements to accommodate his religious needs.

"(4) Where an employee has previously been employed on a schedule which does not conflict with his religious obligations, and it becomes necessary to alter his work schedule, the employer should attempt to achieve an accommodation so as to avoid a conflict. However, an employer is not compelled to make such an accommodation at the expense of serious inconvenience to the conduct of his business or disproportionate allocation of unfavorable work assignments to other employees."

## APPENDIX B

### Equal Employment Opportunity Commission

### RELIGIOUS DISCRIMINATION GUIDELINES

(Effective July 10, 1967)

"Section 1605.1 Observance of Sabbath and other religious holidays.—(a) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath or who observe certain special religious holidays during the year and, as a consequence, do not work on such days.

"(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a) (1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

"(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

"(d) The Commission will review each case on an individual basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people."