OLIN CORPORATION, Plaintiff-Appellee, *v.* ILLINOIS FAIR EMPLOYMENT PRACTICES COMMISSION *et al.*, Defendants-Appellants.

(No. 74-102;

Fifth District—January 15, 1976.

William J. Scott, Attorney General, of Chicago (Paul J. Bargiel and Michael B. Weinstein, Assistant Attorneys General, of counsel), for appellant Fair Employment Practices Com.

Donald C. Rikli, of Highland, for appellant Burl McEvers.

Arthur W. Dulemba, Jr., of Stamford, Connecticut, and Dorothy Kelley, of East Alton, for appellee.

Lee Boothby, of Berrien Springs, Michigan, for amicus curiae Seventh-day Adventist Church.

Paul Franklin, of Chicago, and Edward Leavy and Joy Meyers, both of New York, New York, for amicus curiae Anti-Defamation League of B'nai B'rith.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This appeal is taken from a judgment entered by the circuit court of Madison County reversing an order of the defendant Fair Employment Practices Commission (Commission) finding that plaintiff Olin Corporation (Olin) had unlawfully discriminated against its employee defendant, Burl Leon McEvers, because of his religion. The circuit court ruled in relevant part:

> "Nowhere in the reading of the statutes does this Court find a statutory imposition of a burden on an employer to make 'a good faith effort * * * to reasonably accommodate an employee's genuine and recognized religious beliefs.' (Commission Order at Page 6). The Commission has taken it upon itself to impose this burden and the Court finds this to be an expansion of the legal authority of the Commission.
>
> * * *
>
> The language of the Commission indicates that instead of limiting their ruling to the facts of the case and the applicable Illinois law set forth in the Fair Employment Practices Act and the Con-

stitution of Illinois, they have gone outside this by having their ruling or rationale (Page 6 of the Order), policies, (Page 8 of the Order), and guidelines (not) contained in the language of the Fair Employment Practices Act."

In reversing the Commission and remanding the case for rehearing, the court directed the Commission to consider only statutory law and specifically to disregard "language offered elsewhere, including but not limited to that contained within its own guidelines." In the factual context presented by defendant McEvers' complaint, the ruling of the court below was that the statutory prohibition against religious discrimination did not include an obligation on the part of Olin to make a good faith effort reasonably to accommodate employee McEvers' religious beliefs.

Briefs amicus curiae have been filed by the Seventh-Day Adventist Church and the Anti-Defamation League of B'nai B'rith. This appeal presents the following questions for review: (1) whether section 3(a) of the Illinois Fair Employment Practices Act (Ill. Rev. Stat. 1967, ch. 48, par. 853(a)) requires an employer to make reasonable accommodation of an employee's religious observance of a weekly day of rest; (2) if the Act requires accommodation, whether such a statutory requirement violates either article 1, section 3 of the Illinois Constitution or the First Amendment of the Constitution of the United States; (3) if accommodation is both required by the Act and is not constitutionally prohibited, then under the circumstances of this case does accommodation for the defendant-employee result in undue hardship either to the plaintiff or to other employees, so as to outweigh any requirement of accommodation.

In addition to the foregoing substantive issues arising from the Commission's order, plaintiff-appellee makes certain contentions raising procedural issues. These contentions question the propriety of the Commission conduct in its administrative decision-making process, specifically: (4) whether the participation of Commissioner Lieberman in the determination of the order or the absence of Commissioner Foreman from the determination constituted procedural error requiring a reversal and remand of the order; and (5) whether the Commission erred by refusing to join the Union, which was the collective bargaining representative of the defendant-employee and of other employees affected by the order, as an indispensable party to its procedings and, if so, what corrective action is now appropriate.

Defendant-appellant McEvers began employment with plaintiff Olin Corporation at its East Alton, Illinois, plant in March 1964. At the time of his discharge from Olin's employ on December 6, 1969, defendant McEvers worked a regularly assigned six-day week on the graveyard shift (midnight to 8 a.m.) as a general machinist. Defendant-employee

was one of seven or eight general machinists permanently assigned to this shift. His duties included repairing and maintaining plaintiff's production equipment. As production schedules necessitated, the defendant-employee had been required to work seven days a week.

Plaintiff-employer staffed each shift with the number of general machinists necessary to maintain its production equipment. The work force of seven or eight general machinists on the third shift was approximately half of the work force on each of the other two shifts. In determining the number of machinists asigned to a shift, plaintiff also considered such factors as absenteeism due to vacation, personal problems, and illness. While sporadic unexpected absence was permitted for personal reasons, the plaintiff's policy did not permit any employee to be absent on a regular basis every week from his regularly assigned shift. Overtime hours, if not voluntarily accepted, became mandatory. Pursuant to plaintiff's rules and policy, an employee junior in seniority who refused overtime was terminated.

Conflicting testimony was adduced whether general machinists were "in demand" at plaintiff's plant at the time of defendant McEvers' termination. With the Union's permission plaintiff had accelerated the apprenticeship program for general machinists prior to November, 1969, to meet its increasing production requirements. Many general machinists, including the defendant, were working eight hours of mandatory overtime in November and December of 1969. Shortly after the defendant McEvers was discharged in December, 1969, work schedules for several machinists were reduced to forty hours.

At the time of his termination, the defendant McEvers was a member of District No. 9, International Association of Machinists and Aerospace Workers, a member of the AFL-CIO. Union membership was a condition of his employment. At all times material herein, the Union and the plaintiff have been parties to a collective bargaining agreement which sets forth terms and conditions of employment for employees in the bargaining unit that includes defendant McEvers. The agreement has defined work schedules, work weeks, bidding and transfer rights, and seniority status. Pursuant to the agreement, all the plaintiff's jobs were filled by seniority and without regard to any employee's religious beliefs. With respect to any employee's regular work schedules, no exceptions were allowed for purposes of observing the Sabbath. Each work shift, including the defendant-employee's, was staffed in accordance with the provision of the collective bargaining agreement. It was as a result of the defendant McEvers' junior seniority status that he was assigned permanently to work the "graveyard shift."

In the spring of 1969, some five years after his employment with plain-

tiff, the defendant McEvers began receiving instruction in the teachings of the Seventh-day Adventist Church. The Church teaches that the Sabbath begins at sundown Friday and continues until Saturday evening, a period which may not be spent engaging in secular affairs. As a devout member of the Church, a general machinist would be precluded by his religious beliefs from working the plaintiff's third shift, midnight to 8 a.m., between sundown Friday and sundown Saturday.

At the time of his termination and during the proceedings before the Commission, defendant McEvers' status in the Church was that of an "interested party" professing a "personal belief" in the Church's Sabbath. He had not yet become a baptized member because he was unable to give up smoking, conduct also proscribed by the Church. During his period of instruction beginning spring 1969 defendant-employee worked his permanently assigned third shift on the Church's Sabbath.

In October, 1969, however, the defendant McEvers informed his supervisor regarding his belief in the Sabbath and requested to be excused from a Friday night shift. This request was refused. Shortly thereafter, the defendant-employee authorized his pastor, the Rev. A. John Graham, to approach the plaintiff's supervisory personnel regarding a possible accommodation of his religious beliefs and his Saturday morning work shift requirement. Through Pastor Graham, the defendant offered to work the second shift on Saturday nights at regular pay or to "double over", *i.e.*, to work from 12 midnight Friday to 4 p.m. Friday, at regular pay. Subsequently, he also proposed to; (1) secure a substitute to work Saturday mornings; (2) work a four-day week, Monday through Thursday, until such time as his seniority permitted him to bid and receive another job; or (3) work the Saturday shift (Saturday midnight to 8 a.m. Sunday) at regular pay. Pastor Graham also discussed the matter with the Union which subsequently informed the plaintiff on November 5, 1970, that the Union would not waive any rights under the collective bargaining agreement. Later, the Union similarly informed the Commission's investigator that it intended to hold the plaintiff to the "letter of the agreement."

By November 1969 defendant McEvers had resolved not to work on Saturday mornings. He notified his immediate supervisor of his decision and he did not report for the Saturday morning shift. After having missed two consecutive Saturdays, the defendant-employee was informed by his supervisor that he faced dismissal if his absence continued.

On Friday morning, December 5, 1969, defendant McEvers once again notified his supervisor that he would not report to work that night. Shortly thereafter, he was told to report to the Superintendent of Machine Maintenance at the plant, Richard Glassey. Glassey advised the

defendant that if he did not report for work that Friday it would be considered insubordination, resulting in immediate discharge.

Glassey further informed the defendant that several alternatives to having him work his regular Saturday morning shift had been considered but rejected by the plaintiff. These alternatives included holding over another machinist from the previous shift. In the plaintiff's view, however, this alternative was not feasible because the substitute employee would be working overtime, requiring the plaintiff to pay an overtime premium rate to cover defendant-employee's absence. Similarly, overtime payment would be required if a machinist doubled over by reporting eight hours early. Over the course of the year, such overtime payments would result in approximately $1,000 of increased expense to the plaintiff.

The superintendent explained that trading shifts with another employee was considered but also found impractical. Under the collective bargaining agreement with the Union, other employees' seniority rights to the most desirable shifts would be violated. It was also explained that the defendant McEvers' job could not remain vacant on the Friday evening "graveyard shift" since there were insufficient machinists to provide maintenance services for the production activity. Finally, the defendant-employee was asked if he had any other suggestions or alternative courses of action. He explained that he had attempted to bid on other jobs or more accommodating shifts but was unsuccessful because of his limited seniority under the collective bargaining agreement. At the time of this discussion with his superintendent, the defendant had not attempted to secure a replacement who could work for him Friday nights. Superintendent Glassey advised defendant McEvers to work his regular Friday night shift until his seniority was sufficient to bid on another or until he could find employment elsewhere. Glassey added that he would be glad to recommend the defendant as a good general machinist if he sought another job.

Later, at approximately 3 p.m., defendant McEvers called Glassey and asked if everything could be put off one week. Glassey refused this suggestion. At 10 p.m. the defendant called the plant and told Glassey that he would not come in for work. The next night, Saturday midnight, December 6, the defendant reported for his regular shift. He was given a disciplinary notice and discharge which stated that he was fired for insubordination.

The Union did not protest the plaintiff's decision. And, although aware of his right to do so, defendant McEvers did not file a grievance. He did, however, speak with a union representative on December 10, 1969, who referred him to the Union business representative. The next day defendant McEvers spoke to the representative. After this meeting there was

no further contact between the Union and the defendant regarding his dismissal.

The Tuesday following his discharge, December 9, 1969, defendant McEvers started work with an insurance company, and several months thereafter changed jobs to work for another insurance company. Both positions paid less than his former rate as a general machinist. After his discharge from Olin, McEvers sought jobs at approximately six plants within a thirty-mile radius of his home. None of these companies had vacancies. The estimated difference in pay between his new jobs and his job at Olin Corporation was at the time of the Fair Employment Practices Commission's hearing in September 1970 approximately $2900 plus lost hospitalization benefits.

On December 18, 1969, defendant McEvers filed a timely charge of discrimination with the Equal Employment Opportunity Commission (E.E.O.C.), which, pursuant to the directives of the Civil Rights Act of 1964 (42 U.S.C. § 2000 *et seq.*) deferred action of the Federal charge and referred the matter to the Illinois Fair Employment Practices Commission, a defendant herein.

After investigation the Commission determined that substantial evidence existed to support the allegations that an unfair employment practice had been committed in violation of the Illinois Act. Pursuant to the requirements of the Act, a conciliation conference was held on June 30, 1970, before Commissioner Marvin L. Lieberman. The matter was not settled at the conference and the Commission appropriately issued a notice of public hearing and a complaint of unfair employment practice alleging religious discrimination by the plaintiff.

On September 17, 1970, a hearing on the complaint was convened before a hearing officer of the Commission. On February 25, 1971, an order and decision was entered by such officer in favor of defendant McEvers. The plaintiff filed formal exceptions to this decision on March 15, 1971, and petitioned the Commission for review.

Accordingly, on August 5, 1971, a review hearing was held before Chairman William C. Ives and Commissioners Richard A. Cowen, Helen C. Foreman, and James Kemp. On September 11, 1972, the Commission issued the disputed order, setting forth the Commission's findings of fact and conclusions of law with respect to defendant McEvers' complaint. The Commission reached the following conclusions:

"1. A preponderance of the evidence sustains the complaint filed herein.

2. That Respondent shall re-employ Complainant as a general machinist, and if no other accommodation be agreed upon between the parties that Complainant shall work a four day shift until such

time as his seniority shall entitle him to bid for a job or shift that does not conflict with his religious beliefs.

3. That Respondent shall pay to Complainant an amount equal to the difference between Complainant's actual earnings from the date of his termination and the amount he would have received had he worked a four day week for Respondent, together with interest at the legal rate of six percent from the date of termination. The amount due Complainant shall be computed until such time as Complainant is offered re-employment as provided in paragraph 2 above.

4. The Respondent instruct all of its supervisory personnel in Illinois in writing of the provisions of the Illinois Fair Employment Practices Act, and of their responsibilities under the Act.

5. That Respondent conspicuously post posters supplied by the Fair Employment Practices Commission on all of its employee bulletin boards and in each of its offices used to interview job applicants.

6. That Respondent cease and desist immediately from the unfair employment practices complained of herein.

7. That the Commission shall retain jurisdiction to determine the amount due Complainant pursuant to paragraph 3 above in the event the parties are unable to reach an agreed upon amount."

Three members of the Commission concurred in the Order—Chairman Ives, Commissioner Cowen and a member who did not participate in the review hearing but before whom the earlier conciliation conference had been held, Commissioner Liebermann. Commissioner Kemp dissented from the order. Commissioner Foreman, who participated in the review hearing, did not participate in the final determination.

The plaintiff filed this action for administrative review of the Commission's order. Upon reversal of the Commission's order by the trial court, the defendants perfected this appeal.

The defendants first contend that the trial court erred in reversing the decision and order of the Fair Employment Practices Commission. In particular, the defendants argue that the prohibition against discrimination because of religion, as set forth in section 3(a) of the Fair Employment Practices Act (Ill. Rev. Stat. 1967, ch. 48, par. 853(a)), requires an employer reasonably to accommodate the religious beliefs of an employee. This contention presents a question of law.

In Illinois it is an unfair employment practice:

"(a) For any employer, because of the race, color, religion, national origin or ancestry of an individual to refuse to hire, to segregate, or *otherwise to discriminate against* such individual with

respect to hire, selection and training for apprenticeship in any trade or craft, tenure, terms or conditions of employment." (Emphasis added.) (Ill. Rev. Stat. 1967, ch. 48, § 853(a).)

The language of this statute is substantially the same as the language of the Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e—2 (1973 Supp.)):

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to *discharge any individual or otherwise to discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." (Emphasis supplied.)

In interpreting the above title of the 1964 Civil Rights Act in *Griggs v. Duke Power Co.* (1971), 401 U.S. 424, 28 L.Ed.2d 158, 92 S.Ct. 849, the Supreme Court stated:

"* * * The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity.

* * * Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." (401 U.S. 424, 431-32, 28 L.Ed.2d 158, 164-65, 91 S.Ct. 849, 853-54.)

This court has recently recognized the "effects" doctrine enunciated above in *Griggs* in our recent decision of *City of Cairo v. Fair Employment Practices Com.* (1974), 21 Ill.App.3d 358, 315 N.E.2d 344. In *City of Cairo* we interpreted the above quoted section of the Illinois Fair Employment Practices Act here at issue:

"This court agrees with *Griggs* that the *consequences* of a policy can cause it to be an unfair employment practice regardless of the intent or motive of the employer." (21 Ill.App.3d 358, 363.)

In the instant case, defendants do not allege that plaintiff overtly intended to discriminate against defendant-employee. The company policies underlying the stated reason for defendant McEvers' dismissal, and

in part expressed in the collective bargaining agreement with the Union, are longstanding and are nondiscriminatory on their face. It is the effect of these policies as applied to the defendant-employee of which the defendants complain. They urge that the duty not to discriminate on religious grounds includes an additional obligation on the part of the employer to make a good faith effort to accommodate the religious practices of his employees so long as the accommodation does not impose an undue hardship on the employer. In support of this position the defendants direct the court to a guideline promulgated by the Fair Employment Practices Commission effective July 26, 1968:

> "GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION—OBSERVANCE OF THE SABBATH AND OTHER RELIGIOUS HOLIDAYS
>
> The Illinois Fair Employment Practices Commission hereby issues these Guidelines on Discrimination Because of Religion in accordance with Illinois Revised Statutes, Ch. 48, § 857, Subsection 7. These Guidelines become effective immediately.
>
> Several charges filed with the Commission have raised the question of whether it is discrimination because of religion for an employer to give job examinations at a time or day observed as the Sabbath by persons wishing to take the test, or to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath, or who observe certain special religious holidays during the year, and, as a consequence, do not work on such days.
>
> The Commission believes that the duty not to discriminate on religious grounds, required by Illinois Revised Statutes, Chapter 48, Section 853, Subsection 3(a), includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer, or by the employee at some other time. The employee should possibly be able to rule out hardship even if another of similar qualifications cannot be found, if he himself agrees to do the necessary work either a day before or a day after the Sabbath, even by unpaid overtime, if necessary.
>
> Examination and interviews for employment must be given at

a time when they are available to all and not a time or place which will require a violation of one's religious observances and convictions.

Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

The Commission will review each case on an individual basis in an effort to seek an equitable application of these Guidelines to the variety of situations which arise due to the varied religious practices of the people of Illinois.

ENTERED July 26, 1968

FAIR EMPLOYMENT PRACTICES COMMISSION
SELWYN W. TORFF, Chairman."

The Commission's guidelines are directly taken from Federal guidelines adopted by the EEOC in 1967.

"PART 1605—GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION § 1605.1 Observation of the Sabbath and other religious holidays.

(a) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath or who observe certain special religious holidays during the year and, as a consequence, do not work on such days.

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

(d) The Commission will review each case on an individual

basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people."

Section 713(a), 78 Stat. 265; 42 U.S.C. § 2000e—12; 22 P.R. 10293, July 13, 1967.

The above Federal guidelines, in turn based upon the portion of Title VII hereinbefore quoted, for the first time decreed that the duty not to discriminate on religious grounds included the additional obligation urged by the defendants.

■■ We submit that a fair reading of our Fair Employment Practices Act does not indicate that the General Assembly ever intended to require employers to take affirmative action to accommodate all the religious practices of their employees. The stated objective of the General Assembly was (1) to prevent the "denial of equal employment opportunity because of race, color, religion, national origin or ancestry," and (2) to protect "employers, labor organizations and employment agencies from unfounded charges of discrimination." (Ill. Rev. Stat. 1967, ch. 48, par. 851.) The agency charged with enforcement of this Fair Employment Practices Act was the Illinois Fair Employment Commission. (Ill. Rev. Stat. 1967, ch. 48, par. 855.) The Commission was given the power "To adopt, promulgate, amend and rescind rules and regulations *not inconsistent with the provisions of this Act.*" (Emphasis added.) (Ill. Rev. Stat. 1967, ch. 48, par. 856.05.) Under section 2 of the Act, *Definitions,* " 'Unfair Employment Practices' includes *only* those practices specified in Section 3 of this Act." (Emphasis added.) Ill. Rev. Stat. 1967, ch. 48, par. 852.

■■ Notwithstanding the deference which should be accorded the guidelines and interpretive comments of the Commission, it must be remembered that the power to make the laws for this State is a sovereign power vested in the legislature. (See *People v. Tibbitts,* 56 Ill.2d 56, 305 N.E.2d 152.) The Act only made it unlawful "to refuse to hire, to segregate, or otherwise to discriminate against" an individual because of "his race, color, religion, national origin or ancestry." (Ill. Rev. Stat. 1967, ch. 48, par. 853(a).) By their guidelines, the Commission injected something new and entirely different from discrimination as contemplated by the drafters of the statute. It has required employers not only to tolerate the religious beliefs but also accommodate all of the religious practices of their employees, no matter what they are, even though a hardship is inflicted upon the employer, so long as it is not an *undue* hardship. We find no statutory authority to warrant such treatment of employers.

We observe that the hearing examiner, the Commission, and the circuit court agreed upon the facts but disagreed regarding the legal implica-

tions of those facts. The conclusions reached by the examiner and the Commission are predicated on the standard enunciated in the above guidelines, whereas the findings of the circuit court repudiate this standard. In the absence of Illinois cases dealing with this issue, the Federal decisions regarding religious discrimination in employment, while not controlling, are relevant and helpful precedents.

The recent case of *Reid v. Memphis Publishing Co.* (6th Cir. 1975), 521 F.2d 512 (*Reid II*), is among the more persuasive Federal decisions since it involves an almost identical factual situation under Federal law. The majority in *Reid II* held that section 2000e—2(a) and 2000e—5(g) (which contains the identical "discrimination" language as section 2000e —2) of Title VII of the Civil Rights Act of 1964 did not require employers to accommodate all the religious practices of their employees or prospective employees. This holding had the effect of reversing the 6th Circuit's previous finding in Reid's first appeal, *Reid v. Memphis Publishing Co.* (6th Cir. 1972), 468 F.2d 346 (*Reid I*), that the guidelines in question required employers to make "reasonable accommodations" to the religious needs of employees where such could be accomplished without "undue hardship." In *Reid II* the majority of the justices found no statutory authority for the promulgation of the E.E.O.C. guideline section 1605.1, set forth earlier in this opinion, at the time the rights of the parties in *Reid* cases had accrued in 1967. (Contra, *Hardison v. T.W.A.* (8th Cir. 1975), 527 F.2d 33; *Cummins v. Parker Seal Co.* (6th Cir. 1975), 516 F.2d 544; *Riley v. Bendix Corp.* (5th Cir. 1972), 464 F.2d 113.) The opinion of the court noted that on March 24, 1972, nearly five years after Reid's dismissal for failure to work Saturdays (Reid was also a Seventh Day Adventist) Congress amended the Civil Rights Act of 1964 to define religion (42 U.S.C. § 2000e(j) (1973 Supp.)) as follows:

> "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

Declining to rely on the subsequent enactment of section 2000e(j) in 1972 to establish a congressional intent with respect to the 1964 statute, the court reversed the award of damages for Reid and remanded the case for dismissal of the complaint. In so doing, the court distinguished and refused to extend *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971):

> "We do not read *Griggs* as requiring the appellant, in order to accommodate Reid, to suffer a hardship, to hire two copyreaders when it needs only one, to require it to incur overtime expense of $77 per day, or require it to involuntarily assign other copy-

readers who would have seniority over Reid, to substitute for him on Saturdays, thereby creating havoc and serious moral problems among its employees." 521 F.2d 512, 521.

The dissenting judge in *Reid II* would have affirmed the district court's award of damages; an amount representing the difference between the salary Reid would have earned with the defendant company and what he actually earned in the years before he secured a better paying job. In his view, the legislative history of the 1972 amendment stressed that the guidelines (29 C.F.R. § 1605.1)—did express the prior intention of Congress. The subsequent congressional affirmation strengthened, not weakened, his belief in the validity and applicability of the guideline to the factual situation presented in *Reid II*. He would have applied the standard embodied in the guideline and would have affirmed the district judge's findings of fact:

"*   *   *   Here the record shows that Saturday was the lightest work day of the six regularly scheduled work days. It does not show that accommodating Reid's religious beliefs would have occasioned any added expense of any kind to defendant, unless we assume that other employees would have refused Saturday assignments because Reid was exempted from them. There is no evidence which supports such an assumption because, as the District Judge pointed out, defendant did nothing whatever to explore what it could do to accommodate Reid's religious beliefs. At a minimum, I believe the regulation here involved (now adopted by law) requires more than a simple assertion by an employer that it had always required Saturday availability and would not hire an employee who was not prepared to work on that day.

Furthermore, although the District Judge made no reference to it and placed no reliance upon it, this same employer [defendant] through its other wholly-owned paper, the Memphis Commercial Appeal, operated a seven-day a week newspaper where Reid's ready availability for Sunday work would have been a distinct asset. Yet the record discloses no consideration at all by the employer of any possible exchange of personnel.

There may, of course, be situations where a prospective employee's unavailability for Saturday work would make his employment truly an undue hardship. A small newspaper which needed only one sports reporter could hardly hire a Seventh-Day Adventist for that spot without 'undue hardship.' This case, however, presents no such facts. The District Judge's findings of fact are accurate and complete. They certainly are not 'clearly erroneous.'" 521 F.2d 512, 529.

The dissent relied heavily on the 6th Circuit's prior decision in the *Reid* case *(Reid I)* and upon the Fifth Circuit's opinion in *Riley v. Bendix Corp.* (5th Cir. 1972) 464 F.2d 1113. Both cases upheld the validity of the guidelines (29 C.F.R. § 1605.1) here at issue. Accord, *Cummins v. Parker Seal Co.* (6th Cir. 1975), 516 F.2d 544.

In *Riley*, a Seventh Day Adventist was discharged from his job as a result of his refusal to work on his Sabbath (sundown Friday to sundown Saturday). He then filed suit pursuant to Title VII, and the Federal District Court held for the company (330 F.Supp. 583), finding that it was not guilty of intentional discrimination and was not obliged to accommodate the plaintiff's religious beliefs in any way. On review, the Fifth Circuit, in a unanimous opinion, reversed. The Circuit Court specifically approved the E.E.O.C.'s Guidelines which, like those involved in the instant case, declared that the law required "reasonable accommodation" with the burden of proof being upon the employer to show "undue hardship." 464 F.2d 1113, 1117-1118.

Prior to the *Riley* decision the leading case in this area was *Dewey v. Reynolds Metals Co.* (6th Cir. 1970), 429 F.2d 324, *affirmed by an "equally divided Court,"* 402 U.S. 689, 29 L.Ed.2d 267, 91 S.Ct. 2186 (1971). In *Dewey*, the Sixth Circuit reversed, on several grounds, a lower court decision holding that plaintiff was unlawfully discharged for refusing to work on his Sabbath. Subsequently, however, the Sixth Circuit had an opportunity to explain and amplify its opinion in *Reid I*. In so doing, the Court made clear that its decision in *Dewey* did not purport to invalidate the E.E.O.C. Guidelines.

In *Reid I* the district court had rejected a Title VII claim of a Seventh Day Adventist that he was unlawfully denied a job because he would not work on his Sabbath. Citing *Dewey* the trial court held that there was no duty on the part of the employer to accommodate the applicant's religious beliefs.

On appeal, the Sixth Circuit reversed, holding that *Dewey* was inapplicable. The court explained that the *Dewey* opinion was premised on three grounds:

    (1). That in the *Dewey* case the action was barred because it had previously been submitted to binding arbitration;

    (2). That Dewey's case arose under *earlier* E.E.O.C. guidelines which did *not* require "reasonable accommodation" absent "undue hardship"; and

    (3). That Dewey had been offered a "reasonable accommodation" by his employer which offer was declined. 468 F.2d 346, 349 (6th Cir. 1972).

The sixth Circuit pointed out that the cause of action in *Reid I* arose

at a time when the E.E.O.C. guidelines *required* accommodation and, therefore, the employer could not avail itself of the argument used by the employer in *Dewey* that it had complied with the statute as it was then interpreted by the E.E.O.C. Additionally, the court stated that any doubt which it may have had concerning the validity of the accommodation requirement at the time of its decision in *Dewey* had been laid to rest by the United States Supreme Court's subsequent decision in *Griggs v. Duke Power Co.* (468 F.2d 346, 350.) The *Reid I* Court, therefore, held that the *Griggs* doctrine (*i.e.*, forbidding practices which have the effect of discriminating unless justified by business necessity) fully supported the E.E.O.C. guidelines on religion involving the "reasonable accommodation"—"undue hardship" requirement.

■■ We find the reasoning of the majority in *Reid II* persuasive and refuse to engraft the standards embodied in the Commission's guidelines onto our statute. We note that our State act has not been amended to reflect the 1972 amendment to the Civil Rights Act of 1964 regarding the definition of "religion."[1] Although the record in the instant case shows that the Saturday "graveyard shift" was the lightest of the three regularly scheduled shifts on that day, it also shows that accommodating the defendant McEvers' religious beliefs and practices would have occasioned a hardship on the plaintiff Olin. The record indicates that the work of general machinists was necessary to maintain Olin's production equipment. To substitute an employee for defendant's absence on Saturdays would, in accordance with the collective bargaining agreement with the Union of which defendant was a member, require the plaintiff to pay the substitute overtime. The Union has specifically refused to waive either this overtime requirement or the seniority rights and bumping and bidding procedures established under the agreement it entered with Olin. Over the course of a year, the overtime payments would result in approximately $1,000 of increased expense to the plaintiff. Trading most shifts would, because of defendant McEvers' junior seniority status, violate the terms of the plaintiff's collective bargaining agreement with defendant's union, thus creating a hardship on other employees senior in status. It is apparent that to "accommodate" defendant McEvers would jeopardize the employer's relationship with its other employees and lead to serious labor controversy, and in this regard it is to be noted that the employee has refrained from joining the union as a party, although the employee suggests that the employer is culpable because under the union contract

---

[1] According to the Eighth Circuit's opinion in *Hardison v. T.W.A.* (8th Cir. 1975), 527 F.2d 33, "This amendment has been held to have eliminated all doubt that the guideline at 29 C.F.R. § 1605.1 reflects the will of the Congress. [Citations.]"

it cannot reasonably accommodate. Like the court in *Reid II* we do not read the *Griggs* opinion as requiring the plaintiff here, in order to accommodate defendant McEvers, to hire an extra general machinist for, or reassign one to, the Saturday morning "graveyard shift." We do not read our Illinois statute as requiring the plaintiff to accommodate the defendant's religious practice in any of the above manners.

Accordingly, we affirm the judgment of the circuit court of Madison County.

JONES and G. J., MORAN, JJ., concur.