(Nos. 48318-19 cons.-

OLIN CORPORATION, Appellee, v. THE FAIR EMPLOYMENT PRACTICES COMMISSION *et al.,* Appellants.

*Opinion filed September 20, 1977.*

William J. Scott, Attorney General, of Springfield (Paul J. Bargiel and Stephen R. Swofford, Assistant Attorneys General, of Chicago, of counsel), for appellant Fair Employment Practices Commission.

Donald C. Rikli, of Highland, for appellant Burl Leon McEvers.

Dorothy Kelley, of East Alton (Arthur W. Dulemba,

Jr., of Stamford, Connecticut, of counsel), for appellee.

Paul Franklin, of the Anti-Defamation League of B'nai B'rith, of Chicago (Arnold Forster, Jeffrey P. Sinensky, and Joy Meyers, of the Anti-Defamation League of B'nai B'rith, of New York, New York; Norbert N. Rosenthal, of the National Jewish Commission on Law and Public Affairs, of Chicago; and Dennis Rapps, of the National Jewish Commission on Law and Public Affairs, of New York, New York, of counsel), for *amici curiae* Anti-Defamation League of B'nai B'rith and National Jewish Commission on Law and Public Affairs.

MR. CHIEF JUSTICE WARD delivered the opinion of the court:

The question presented here concerns the claimed duty of an employer, under section 3(a) of the Fair Employment Practices Act (Ill. Rev. Stat. 1969, ch. 48, par. 853(a)), to reasonably accommodate to an employee's religious beliefs which prohibit him from working on Saturdays. The Illinois Fair Employment Practices Commission found that Olin Corporation had unlawfully discriminated against Leon Burl McEvers, in that it failed to reasonably accommodate to his religious beliefs. The circuit court of Madison County reversed the Commission's order and the appellate court affirmed (34 Ill. App. 3d 868). We allowed petitions for leave to appeal filed by the Commission and McEvers under Rule 315 (58 Ill. 2d R. 315).

The evidence presented to the Commission's hearing officer showed that McEvers was hired by Olin in 1964 and after training in an apprentice program was assigned to the midnight to 8 a.m. "graveyard shift" as a general machinist. His duties involved maintenance of Olin's production equipment and the fabrication of replacement parts in the shop. Olin staffed each shift with a sufficient

number of general machinists to maintain the production equipment. In determining the number of general machinists to assign to each shift, Olin considered such factors as the normal absences of employees due to vacation, illness and personal problems. There were seven or eight general machinists permanently assigned to the "graveyard shift," which was approximately half of the number on each of the other two shifts. While occasional absences of employees for personal reasons were permitted, Olin did not permit any employee to be absent on a regular basis every week. Overtime work at busy periods, if not voluntarily accepted by an employee, became mandatory in order of seniority with the junior employees being the first required to do overtime work. An employee who refused to accept overtime work would be discharged.

McEvers was a member of District No. 9, International Association of Machinists and Aerospace Workers, and membership was a condition of his employment. At all times concerned here the union and Olin had a collective bargaining agreement which governed the terms and conditions of employment. Under this agreement all positions were governed by seniority without regard to religious beliefs. Each shift was staffed according to the seniority provisions of the agreement, and where there were vacancies on a shift they were filled by the employee with the greatest seniority who had bid for the position. So far as the regular work schedules of employees were concerned, absences were not allowed for the purpose of observing the Sabbath. It was because of McEvers' low rank in seniority that he was assigned to the least popular "graveyard shift."

In 1969 McEvers began receiving instructions in the teachings of the Seventh-day Adventist Church. According to the record, the church teaches that the Sabbath begins at sundown on Friday and continues until sundown on Saturday, and it is a period which may not be spent in

secular work. At the time of his discharge by Olin, McEvers had not yet become a baptized member of the church, since he had not been able to give up smoking, an activity proscribed by the church. The Reverend A. John Graham, the pastor of the church attended by McEvers, described McEvers' status in the church as that of an "interested party."

In October of 1969 McEvers informed his foreman of his beliefs in the teachings of the church and requested to be excused from his Friday-night shift. At the time, everyone on his shift was working a regularly assigned six-day workweek. This request was refused, and McEvers then asked Reverend Graham to speak with management personnel of Olin concerning an accommodation which would allow McEvers to observe the Sabbath. Through Reverend Graham, McEvers advised Olin that he was willing to (1) work at other times at regular pay to make up for his loss of time, (2) secure a substitute to work his Saturday shift or, (3) work a four-day week, Monday through Thursday, until such time as he had developed sufficient seniority to bid successfully for a position on another shift. McEvers' situation was also discussed by Reverend Graham with the union, which informed Olin by letter on November 5, 1969, that it would not waive any involved rights under the collective bargaining agreement. Later the union also informed the Commission's investigator that it would hold Olin to the "letter of the agreement."

In November of 1969 McEvers informed his supervisor that he would no longer work his Saturday-morning shift. After being absent on two consecutive Saturdays he was informed by his supervisor that he would be dismissed if these absences continued. On Friday morning, December 5, 1969, he was told to report to Superintendent Richard Glassey, who informed McEvers that if he did not report for work that Saturday he would be dismissed for

insubordination. McEvers was further advised that Olin had considered possible accommodations but had rejected them. Glassey explained that the position could not remain vacant on Saturday mornings, since that would result in an insufficient number of machinists to perform the necessary maintenance services during the shift. The alternatives of filling the vacancy by holding another employee from the previous shift or having one report early and then "doubling over" were rejected since such employees would receive overtime compensation that would cost Olin $1,000 in increased salary expenses in the course of a year. Trading shifts with another employee was rejected since this would violate the seniority provisions of the collective bargaining agreement, rights which the union would not waive.

McEvers informed Glassey he had attempted to bid on jobs for a shift that would resolve his problem but had been unsuccessful because of his low seniority. He had not attempted to secure a voluntary replacement to work for him on Saturday mornings. Glassey suggested that McEvers work his regular Saturday-morning shift until the time he had developed seniority sufficient to bid successfully for another shift or until he found employment elsewhere.

Later that day McEvers telephoned Glassey and requested that any decision be deferred for another week. Glassey refused, and McEvers informed Glassey he would not report for work on Saturday. When McEvers reported for his next regular shift he was given a disciplinary and discharge notice which stated that his dismissal was on the ground of insubordination.

The Commission ruled that although Olin had not intentionally discriminated against McEvers because of his religion, it had committed an unfair employment practice by failing to take steps to reasonably accommodate to McEvers' religious beliefs. Its order stated:

"1. A preponderance of the evidence sustains the

complaint filed herein.

2. That Respondent shall re-employ Complainant as a general machinist, and if no other accommodation be agreed upon between the parties that Complainant shall work a four day shift until such time as his seniority shall entitle him to bid for a job or shift that does not conflict with his religious beliefs.

3. That Respondent shall pay to Complainant an amount equal to the difference between Complainant's actual earnings from the date of his termination and the amount he would have received had he worked a four day week for Respondent, together with interest at the legal rate of six percent from the date of termination. The amount due Complainant shall be computed until such time as Complainant is offered re-employment as provided in paragraph 2 above.

4. That Respondent instruct all of its supervisory personnel in Illinois in writing of the provisions of the Illinois Fair Employment Practices Act, and of their responsibilities under the Act.

5. That Respondent conspicuously post posters supplied by the Fair Employment Practices Commission on all of its employee bulletin boards and in each of its offices used to interview job applicants.

6. That respondent cease and desist immediately from the unfair employment practices complained of herein.

7. That the Commission shall retain jurisdiction to determine the amount due Complainant pursuant to paragraph 3 above in the event the parties are unable to reach an agreement upon amount."

Olin filed an action to review this order under the provisions of the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*). As has been stated, the circuit court reversed the Commission, holding that the Fair Employment Practices Act could not be construed as imposing an obligation on employers to affirmatively accommodate an employee's religious beliefs. The court said that the Commission's promulgation of a guideline requiring such accommodation was beyond its statutory authority and remanded the cause for rehearing, directing

the Commission to disregard the guideline. The appellate court affirmed.

The Commission contends here that the Fair Employment Practices Act does require an employer to accommodate to an employee's religious beliefs and argues that the Commission's determination that Olin could have reasonably accommodated to McEvers' religious beliefs is supported by the record. Olin's position is that if the Act requires an employer to reasonably accommodate to religious beliefs the requirement violates both article I, section 3, of the Constitution of Illinois and the first amendment of the Constitution of the United States, which prohibits the establishment of religion. It says, too, that under the circumstances here an accommodation would result in "undue hardship," so as to make inapplicable any requirement of accommodation. Olin also raises questions concerning procedures used by the Commission in making its determination and the failure to join the union as a necessary party to the proceeding.

Section 3 of the Fair Employment Practices Act provides in part:

> "It is an unfair employment practice:
> (a) For any employer, because of the race, color, religion, national origin or ancestry of an individual to refuse to hire, to segregate, or otherwise to discriminate against such individual with respect to hire, selection and training for apprenticeship in any trade or craft, tenure, terms or conditions of employment." (Ill. Rev. Stat. 1969, ch. 48, par. 853(a).)

On July 26, 1968, the Commission, pursuant to its statutory power to "promulgate *** rules and regulations not inconsistent with the provisions of this Act" (Ill. Rev. Stat. 1969, ch. 48, par. 856.05), announced a guideline on discrimination because of religion which provides in part:

> "Several charges filed with the Commission have raised the question of whether it is discrimination because of religion for an employer *** to discharge or refuse to

hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath, or who observe certain special religious holidays during the year, and, as a consequence, do not work on such days.

The Commission believes that the duty not to discriminate on religious grounds, required by Illinois Revised Statutes, Chapter 48, Section 853, Subsection 3(a), includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer, or by the employee at some other time. The employee should possibly be able to rule out hardship even if another of similar qualifications cannot be found, if he himself agrees to do the necessary work either a day before or a day after the Sabbath, even by unpaid overtime, if necessary.

\* \* \*

Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

The Commission will review each case on an individual basis in an effort to seek an equitable application of these Guidelines to the variety of situations which arise due to the varied religious practices of the people of Illinois."

Federal courts have divided on the question of whether, in the absence of an explicit statutory provision, employers were obligated under title VII of the Civil Rights Act of 1964 to reasonably accommodate to the religious needs of employees where such accommodations could be made without undue hardship on the employer's business. (Compare *Dewey v. Reynolds Metals Co.* (6th

Cir. 1970), 429 F.2d 324, *aff'd by an equally divided court* (1971), 402 U.S. 689, 29 L. Ed. 2d 267, 91 S. Ct. 2186, and *Reid v. Memphis Publishing Co.* (6th Cir. 1975), 521 F.2d 512, with *Riley v. Bendix Corp.* (5th Cir. 1972), 464 F.2d 1113, and *Reid v. Memphis Publishing Co.* (6th Cir. 1972), 468 F.2d 346.) We need not decide this question under our statute, for even if it is assumed for purposes of this case that the Fair Employment Practices Act requires an employer to reasonably accommodate to the religious needs of employees where it can be done without undue hardship on the employer's business, we judge that Olin proved that undue hardship rendered the requested accommodations unreasonable.

The circumstances in the recent case of *Trans World Airlines, Inc. v. Hardison* (1977), 432 U.S. 63, 53 L. Ed. 2d 113, 97 S. Ct. 2264, closely resemble those in this appeal. There the United States Supreme Court considered the boundaries of an employer's obligation under title VII of the Civil Rights Act of 1964 to accommodate to an employee whose religious beliefs opposed his working on Saturdays. At the time involved in *Hardison* title VII of the Civil Rights Act of 1964 required this accommodation. (432 U.S. 63, 76 & n.11, 53 L. Ed. 2d 113, 126 & n.11, 97 S. Ct. 2264, 2272 & n.11; see 42 U.S.C. sec. 2000e(j) (Supp. 1974).) Hardison was hired by Trans World Airlines (TWA) in 1967, and he joined Local No. 1650 of the International Association of Machinists and Aerospace Workers (IAM). TWA and IAM had a collective bargaining agreement that governed terms of employment and included a seniority provision which controlled job assignments.

In 1968 Hardison joined the Worldwide Church of God, which teaches that one must observe the Sabbath by refraining from work from sunset on Friday until sunset on Saturday. When he informed TWA of this religious objection he was referred to the union's shop steward and

the matter was temporarily resolved when Hardison transferred to the less desirable 11 p.m. to 7 a.m. shift, which allowed him to observe his Sabbath. A little later, however, Hardison voluntarily transferred to another work location, where he was low in seniority, and was therefore assigned Friday-night and Saturday shifts. TWA again referred the matter to IAM, and the union demanded that any accommodation comply with the seniority provisions of the collective bargaining agreement. A proposal that Hardison work only four days a week was rejected by TWA. His work was essential to TWA's operations. To fill Hardison's vacancy with a supervisor or another employee from another area would have undermanned a different work operation. To have someone, not regularly assigned to the shift, to work Hardison's shift also would have required overtime payments by TWA, and to have him change shifts with another employee would have violated the seniority provisions of the collective bargaining agreement.

The Supreme Court held that TWA had made reasonable efforts to accommodate to Hardison's religious needs and that each of the suggested accommodations would have imposed an undue hardship on TWA within the meaning of title VII.

Referring to the seniority provisions of the bargaining agreement, the court observed that had TWA ordered a senior employee to switch shifts with Hardison, it would have deprived that employee of his right to exercise a shift preference, as well as his seniority rights under the collective bargaining agreement.

> "It was essential to TWA's business to require Saturday and Sunday work from at least a few employees even though most employees preferred those days off. Allocating the burdens of weekend work was a matter for collective bargaining. In considering criteria to govern this allocation,

TWA and the union had two alternatives: adopt a neutral system, such as seniority, a lottery, or rotating shifts; or allocate days off in accordance with the religious needs of its employees. TWA would have had to adopt the latter in order to assure Hardison and others like him of getting the days off necessary for strict observance of their religion, but it could have done so only at the expense of others who had strong, but perhaps nonreligious reasons for not working on weekends. There were no volunteers to relieve Hardison on Saturdays, and to give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath.

Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities. [Citation.] Indeed, the foundation of Hardison's claim is that TWA and IAM engaged in religious *discrimination* in violation of section 703(a)(1) when they failed to arrange for him to have Saturdays off. It would be anomalous to conclude that by 'reasonable accomodation' Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far." 432 U.S. 63, 80-81, 53 L. Ed. 2d 113, 129, 97 S. Ct. 2264, 2275.

As to the other suggested accommodations, the Supreme Court stated that "[b]oth of these alternatives would involve costs to TWA, either in the form of lost efficiency in other jobs or higher wages." (432 U.S. 63, 84, 53 L. Ed. 2d 113, 131, 97 S. Ct. 2264, 2276-77.) The court said:

> "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship. Like abandonment of the seniority system, to require TWA to bear additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees on the basis of their religion. By suggesting that TWA should incur certain costs in order to give Hardison Saturdays off the Court of Appeals would in effect require TWA to finance an additional Saturday off and then to choose the employee who will enjoy it on the basis of his religious beliefs. While incurring extra costs to secure a replacement for Hardison might remove the necessity of compelling another employee to work involuntarily in Hardison's place, it would not change the fact that the privilege of having Saturdays off would be allocated according to religious beliefs." 432 U.S. 63, 84-85, 53 L. Ed. 2d 113, 131, 97 S. Ct. 2264, 2277.

The holding in *Hardison* is applicable here. The Commission specifically found that Olin had not intentionally discriminated against McEvers because of his religion. The direct cause of his discharge was Olin's production requirements, which made it necessary to have a full staff of machinists on each shift to service equipment, and the seniority provisions of the bargaining agreement, which prevented the defendant from transferring to a shift to accommodate to his religious beliefs.

McEvers did not secure a voluntary replacement to take his Saturday-morning shift. Had Olin ordered a senior employee to trade shifts with McEvers it would deprive that employee of his shift preference and rights under the bargaining agreement. The union refused to waive its rights under the collective bargaining agreement. If Olin were required to allow McEvers to work a four-day week, the result would have been either an undermanned crew of machinists on the Saturday-morning shift or overtime payments by Olin to substitute employees, which would have cost the employer $1,000 in the course of a year. Even if Olin had agreed to pay overtime in order to have a replacement for McEvers on Saturday mornings, it would have been granting McEvers the privilege of having Saturdays off because of his religious beliefs. This could be said to discriminate against Olin's other employees, who would still be required to fulfill their normal terms of employment.

Considering this record, we must conclude that the Commission's decision that Olin could have made an accommodation to McEvers' religious beliefs without undue hardship in the conduct of its business is not supported by a required preponderance of the evidence. See Ill. Rev. Stat. 1969, ch. 48, par. 858(f); *Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 282.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*