SALT CREEK FREIGHTWAYS,
Appellant (Petitioner below),

v.

WYOMING FAIR EMPLOYMENT PRAC-
TICES COMMISSION and Kathleen
Banyai, Appellees (Respondents below).

No. 4960.

Supreme Court of Wyoming.

Aug. 7, 1979.

Richard E. Day and Richard L. Williams of Wehrli & Williams, Casper, for appellant.

Gerald A. Stack, Deputy Atty. Gen. and Thomas C. Bogus, Asst. Atty. Gen., Cheyenne, for Wyoming Fair Employment Practices Commission, appellee.

Paul J. Hickey of Rooney, Horiskey, Bagley & Hickey, Cheyenne, for Kathleen Banyai, appellee.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.**

GUTHRIE, Justice.

Salt Creek Freightways, as appellant, pursues this appeal from a judgment of the district court of Natrona County, which affirmed an order of the Wyoming Fair Employment Practices Commission,[1] an appellee herein. This order found that Salt Creek had been guilty of discrimination when it discharged Kathleen Banyai, an appellee, because of her religious creed and beliefs. Based upon this finding, the Commission ordered Salt Creek to pay $950.40 in wages and the sum of $2,847.75 as attorney's fees.

Throughout this opinion, for the sake of brevity, Salt Creek Freightways will be described as Salt Creek. The Wyoming Fair Employment Practices Commission will be designated as the F.E.P.C., appellee-Kathleen Banyai will be described as Banyai, and the Employment Security Commission will be described as E.S.C.

Banyai was employed by Salt Creek on January 7, 1974. At the time of her employment, she received a handbook, which

---

** At the time of oral argument, Guthrie, J., was Chief Justice. He retired from the court on December 31, 1978. By order of the court, entered on January 1, 1979, he has been retained in active judicial service pursuant to Article 5, Section 5, Wyoming Constitution, and Section 5–1–106(f), W.S.1977, and has continued to participate in the decision and opinion of the court in this case.

1. Although we refer to the Wyoming Fair Employment Practices Commission, by statute the commission is denominated the Wyoming Fair Employment Commission. Throughout the proceedings below, F.E.P.C. was used, as was also done in all proceedings in this court. We shall use the denomination F.E.P.C. for the sake of consistency but note that in current practice the F.E.P.C. is called Wyoming Fair Employment Commission (W.F.E.C.).

set out the working rules and conditions and the policy governing vacations, sick leave, and leaves of absence. Banyai does not claim that she was unfamiliar with these and concedes that she understood that she was entitled to a one-week vacation after being employed for one year. These rules further provided for a maximum of six-days paid sick leave, if necessary, because of sickness, and the provision for personal leave of absence without pay, upon written application, which was not to be granted "except for various, significant reasons."

After her original employment, she joined the World Wide Church of God and became a baptized member in August of 1974. There is no suggestion that during her employment she had not properly performed her work up to the time of discharge, although she had been absent from work for over 105 hours between the date of her employment and September 26. During the summer months, she learned that members of her church were supposed to attend a convocation in California sometime late in September or early October. On September 12, she requested a leave of absence from her supervisor, Mr. Klone, for a Holy Day observance on September 17. The supervisor at that time told her that she had been taking a lot of time off, but granted her permission to be absent on that day. It was during this conversation that she advised him of her intention to attend the church convocation in California beginning September 26 to and until October 10. This was the first time that her employer learned of her church affiliation. The supervisor at that time told her that he would not let her go because there was no one available to handle her work, and he had too short a notice to train someone else. This was followed by a letter on September 20, which detailed the reasons for the denial of her application with a comment upon her absenteeism. The letter did confirm permission to take September 17 off. In various conversations during this interim, Banyai reiterated her intention to be absent from her work from September 26 to October 10, to attend the convocation, although

she was told she would be terminated if she did so because of the hardship upon her fellow employees. Her minister advised her against terminating employment. However, she did absent herself for this period and attended the convocation. Salt Creek discharged appellee as of September 25 because of her absence.

After her discharge, Banyai filed a claim with the E.S.C. for benefits by way of unemployment compensation from September 27. A deputy of that commission determined that she was not entitled thereto, because her discharge by Salt Creek was properly based upon her misconduct. Banyai then pursued her appeal from that deputy's determination and was granted and received a full hearing before the appeals examiner. After a full hearing thereon, the appeals examiner, acting for the commission, reversed the decision of the deputy insofar as he found that the discharge was based upon her "misconduct connected with her work."

The E.S.C. order found that "for having voluntarily left her most recent employment *without good cause*, the claimant is disqualified from October 13th, 1974, through February 15th, 1975." (Emphasis added.) This decision was rendered on December 4th, 1974, and appellee did not appeal this ruling as was her right under § 27–27 D VII, W.S.1957 (now designated as § 27–3–107(d)(vii), W.S.1977.

On October 15, 1974, she had filed a verified complaint with the F.E.P.C. No further action is reflected thereon until February 19, 1975, when an order and decision of the commission recites that a determination had been made that there was probable cause to believe that the respondent had violated § 27–261(1), W.S.1957 (now designated as § 27–9–105(a)(i), W.S.1977). This order further recites that as a result of the investigation conducted pursuant to their rules of practice and procedure that a settlement agreement was offered to respondent and complainant by the director of the commission. The respondent refused to sign the same. We are in the dark as to the terms of this agreement.

On March 27, 1975, Salt Creek filed their answer to Banyai's complaint, which was served upon the commission and received March 31, 1975. This was set for hearing on May 6, 1975. There was an order and decision entered by the commission adverse to this appellant dated July 11, 1975, and in pursuit of an appeal by appellant, the court remanded this matter and entered an order permitting Salt Creek to present additional evidence to the F.E.P.C., as follows:

(1) The decision and order of the appeals examiner of the E.S.C.;

(2) An order of the E.S.C. itself;

(3) The appeal of the said Banyai; and

(4) The transcript of the proceedings of the hearing held before the appeals examiner, which was made a part of the record on appeal.

The court observed that before it could be in a position to review the said matter, this entire record including all this evidence should be presented to the F.E.P.C. and reviewed by them upon the entire record, and a decision be made therefrom.

Upon the remand of this matter to the F.E.P.C., hearing was had on January 6, 1977, with the same result, and the decision and order of March 28, 1977, noted that "the transcript of the evidence from the appeals examiner of the Employment Security Commission, the decision and order of the examiner, and the order of the Employment Security Commission were made a part of the evidence herein, and they were duly considered together with all other evidence in this matter by the commission."

Among the asserted errors urged by Salt Creek is the following:

"Failing to hold as a matter of law that the decision of the Wyoming Employment Security Commission that Banyai was not discriminated against on account of her religious practices is a bar to relitigation of that issue before the Wyoming Fair Employment Commission under the doctrine of *res judicata*."

It is necessary to make disposal of this issue before giving consideration to any of the other asserted errors. If this conten-tion is correct, there are no other matters which can properly be reached in resolution of this case.

At one time, there appears to have been considerable authority that *res judicata* did not apply to administrative decisions. Davis, *Administrative Law Treatise*, § 18.02, p. 548 (1958). This was rapidly changed, and it is now almost universally recognized that the rule is to be applied to such decisions. Davis, *Administrative Law Text*, 3d Ed., § 18.02, p. 361.

Cases which hold that the doctrine of *res judicata* or its principles are applicable to administrative decisions under certain conditions are: *Morin v. J. H. Valliere*, 113 N.H. 431, 309 A.2d 153, 155 (1973); *Woodlawn Area Citizens Association v. Board of County Commissioners for Prince George's County*, 241 Md. 187, 216 A.2d 149, 153 (1966); *Retail Clerks Union, Local 1401, Retail Clerks International Association AFL–CIO v. National Labor Relations Board*, 149 U.S.App.D.C. 370, 376, 463 F.2d 316, 322 (1972); *Harrah v. Richardson*, 4th Cir., 446 F.2d 1, 2 (1971); *State v. District Court*, 259 Minn. 228, 107 N.W.2d 307, 310 (1960).

Although these authorities speak in terms of *res judicata*, it might be suggested that they really recognize and apply *collateral estoppel* to the field of administrative law. This is not entirely unusual as noticed by Chief Justice Warren in the footnote to *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326 (n. 6), 75 S.Ct. 865, 99 L.Ed. 1122 (1955), which calls attention to the fact that *Restatement of the Law of Judgments*, Ch. 3, §§ 47, 48, & 68 (1942), uses the term *res judicata* broadly "to cover merger, bar, collateral estoppel, and direct estoppel."

*Res judicata* is primarily and originally a legal doctrine and is normally based upon the assertion and the theory of the same cause of action so that it can hardly be strictly applied to administrative hearings. But, decisions should not turn upon such fine distinctions or alleged fine distinctions between these doctrines in administrative law cases. The propriety of the application

of the principles of *collateral estoppel* to such proceedings has been recognized, although in many cases it has been described as *res judicata.*

The Supreme Court of the United States in *United States v. Utah Construction and Mining Co.*, 384 U.S. 394, 421–422, 86 S.Ct. 1545, 1559–1560, 16 L.Ed.2d 642, 660 (1966), has recognized the propriety of this application:

" . . . [W]e note that the result we reach is harmonious with general principles of *collateral estoppel.* Occasionally courts have used language to the effect that *res judicata* principles do not apply to administrative proceedings, but such language is certainly too broad. When an administrative agent is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce the repose. [Citing cases.] . . ."

The doctrine of *collateral estoppel* has much in common with *res judicata,* except that it does not involve the same cause of action but does involve identical issues necessary for disposal of the controversy. *Roush v. Roush,* Wyo., 589 P.2d 841, 843 (1979) (per curiam); *Lawlor v. National Screen Service, Corp., supra.* The findings of the E.S.C. and the F.E.P.C. demonstrate the identity of the issues necessary for the disposal of the controversies submitted to the commission. The E.S.C. finding was as follows:

"The claimant's right to observe her Sabbath or other holy days of her church is not questioned and the constitutional guarantee of the free exercise of her religion is granted. Such right, however, may not be extended to an indefinite number of non-Sabbath days before and after the Sabbath or other Holy Day. If the claimant had quit work because of an employer requirement that she work on the Sabbath or other Holy Day she would then have been considered to have left her employment with good cause. The claimant agrees that she was not required by a mandate of her church to attend the function in question. In order to do so she was absent from Casper for 15 days. During that time she missed 11 working days. She agrees that had she not made the trip she could have worked on all days except October 1 and October 8. She was aware that if she took the time off after being denied a leave of absence by her employer she would be replaced. In so doing she voluntarily left her employment. The employer's denial of the claimant's request for leave was not arbitrary but was based upon the claimant's earlier absences and the undue burden which her absence would place on other employees. For purposes of establishing entitlement to unemployment benefits it must be concluded that the claimant left her employment without good cause and is subject to disqualification."

Implementing this order is the following decisional paragraph:

"For having voluntarily left her most recent employment without good cause the claimant is disqualified for benefits from October 13, 1974 through February 15, 1975. Accordingly, $1,096 (90%) of her accrued benefit credits during her benefit year ending October 12, 1975 are forfeited."

Thereafter, in its determination of Banyai's claim, the F.E.P.C. found:

"9. The COMMISSION finds that the sole reason for COMPLAINANT'S discharge was that she took an unapproved leave of absence to attend a regional religious convocation of the Worldwide Church of God held in Pasadena, California."

Then, in its "Conclusions of Law," paragraph 7, the commission stated:

"7. The COMMISSION finds that COMPLAINANT has been discriminated against by the RESPONDENT'S use of her creed as the standard or criteria for her termination in violation of W.S. 27–261(1)."

These findings illustrate that there was only one basic question presented in both of these hearings; i. e., the reason for employ-

ee-Banyai's termination by Salt Creek, and that in both proceedings she rested her claim upon the basis that she was improperly discharged as a result of a religious discrimination and her observance of religious holidays, and the actions of both separate commissions are based upon the identical factual situation.

After a full hearing thereon with notice and with Banyai present, the E.S.C. had found, as before mentioned, that she had voluntarily left her employment *without good cause.* With apparent dissatisfaction with the result, Banyai pursued no appeal from the finding of the E.S.C. although she had the right of appeal from such determination, which became final. Section 27–27 D V, W.S.1957 (now designated as § 27–3–107(d)(v), W.S.1977). She then pressed her complaint with the F.E.P.C. with the resulting order from which this appeal is made.

No matter how skillful a semantic approach may be employed in suggesting that each such commission has as its directed purpose a different aim or aims, this cannot obscure the clear fact that there were identical parties and identical factual issues earlier determined at a contested matter before the E.S.C., at which the appellee-Banyai appeared.

We find most persuasive the cases of *Umberfield v. School District No. 11, Joint Counties of Archuleta and LaPlata,* 185 Colo. 165, 522 P.2d 730 (1974); and *Colorado Springs Coach Company v. State Civil Rights Commission,* 35 Colo.App. 378, 536 P.2d 837 (1975), and can see no valid reason not to follow these holdings nor to criticize the logic and basis thereof with the further comment that it is most unusual to find cases as similar.

In *Umberfield, supra,* claimant was a tenured teacher who applied for time off to celebrate certain holy days of the World Wide Church of God. The school board decided against such application, and Umberfield did not teach on these days but did attend these church meetings. He was dismissed by the board, and upon appeal a full adversary hearing was had before a full teacher tenure panel, and upon the recom-

mendation of the panel, the board terminated his contract. He did not seek judicial review, which was available. Thereafter, he filed a complaint with the Colorado Civil Rights Commission charging, as here, that he had been dismissed because of his religious beliefs. The commission held that Umberfield was discharged because of his religious belief and in violation of the law. On appeal, the Court held that Umberfield's failure to seek judicial relief by way of review of the decision of the teacher tenure panel prevented him from relitigating his claim before the Civil Rights Commission. That court's reasons are set out at page 734 of 522 P.2d thereof as follows:

> "Umberfield did not seek judicial review of the adverse recommendation of the Teacher Tenure Panel and his subsequent dismissal in the school board. Instead he instituted a new proceeding before the Civil Rights Commission which is before us now. Because Umberfield had a full adversary hearing before the Teacher Tenure Panel which had the power to determine all his claims of religious discrimination, we hold that the doctrine of *res judicata* operates as a bar to the relitigation of issues which Umberfield raised or could have raised in the hearing before that panel and on judicial review. [Citing cases.] . . ."

The second case, *Colorado Springs Coach Company v. Civil Rights Commission, supra,* involved a claim for unemployment compensation with the denial thereof as in this case. Claimant based his claim upon asserted racial discrimination. During that proceeding, he filed another complaint with the Colorado Civil Rights Commission alleging that he was discharged because of illegal discrimination. There, as here, the Civil Rights Commission disregarded *res judicata* as a defense. Based upon *Umberfield,* the court held the defense applied and commented citing from *Umberfield* about the anomalous position that the court would occupy if it might be compelled to affirm two opposite results of two separate bodies.

Although we could comfortably base our disposal of this matter upon these two Colo-

rado cases, *Davis, supra,* at page 559, has enunciated a rule that is remarkably close in its application and would seem to have been uttered for application to just such a factual situation as we have in this case, when this text says:

> "True the doctrine of *res judicata* should be applied in full force to some administrative actions and this seems clear beyond question. The doctrine is at its best and it applies to an adjudication of past facts where the second proceeding involves the same claim or transaction."

The court in *Stuckey v. Weinberger,* 9th Cir., 488 F.2d 904, 911 (1973), cites this latter part of this statement with approval and adds:

> " . . . In those situations, the findings and decisions are res judicata and 'the question whether the (tribunal making the decision is) an agency or a court is immaterial.' . . ."

It has been said that a decision of an administrative board is conclusive if a judicial review is granted by statute and no appeal be taken. *Campbell v. Superior Court, In and For County of Maricopa,* 18 Ariz.App. 287, 501 P.2d 463, 465 (1972), and cases collected therein. Thus, the decision of the E.S.C. became conclusive when Banyai failed to appeal.

In our society, which is witnessing such increases in the field of activity of administrative bodies and the proliferation of their actions, the protection of citizens from being harassed and vexed by repeated hearings on the same matter is of monumental importance. It may not be amiss to note the entirely human instinct that governs the operation of such administrative bodies, and that they, when exposed to the temptation to do so, have difficulty resisting opportunity to enhance their power and importance by assertions of jurisdiction in matters already in the hands of some other competent administrative body.

Because the unappealed order of the E.S.C. was final and conclusive, any redetermination of this issue by the F.E.P.C. was beyond its power and barred.

We do not find anything in our statutory scheme that would demonstrate any legislative intent to give primacy to the F.E.P.C.

Reversed.

ROSE, Justice, dissenting, with whom McCLINTOCK, Justice, joins.

I will dissent in the form of a response to the majority opinion, together with a discussion of the issues I would have considered had I been writing for the court.

The parties will be referred to as follows: Salt Creek Freightways-appellant, as "Salt Creek"; Kathleen Banyai-appellee, as "Banyai;" and Wyoming Fair Employment Commission, as "Commission."

This appeal had its origin in a complaint filed by Banyai with the Commission, wherein it was alleged that she had been discharged by Salt Creek because of her religious creed and that her dismissal was in violation of § 27–9–105, W.S.1977, which provides, in pertinent part:

> "(a) It shall be discriminatory or unfair employment practice:
>
> "(i) For an employer . . . to discharge . . . any person otherwise qualified, because of . . . creed, . . ."

Salt Creek responded, alleging that the complaint failed to state a claim upon which relief could be granted and denied all allegations that it discriminated against Banyai.

A hearing was held before the Commission on May 6, 1975, and by order dated July 11, 1975, the Commission issued its decision in favor of Banyai and against Salt Creek. The order found, among other things, that the reason for Banyai's discharge was that she took an unapproved leave of absence to attend a religious convocation of the Worldwide Church of God; that Salt Creek refused Banyai's requested leave of absence to attend the convocation, did not modify its unqualified refusal of the leave of absence, and did not attempt to negotiate any compromise with Banyai regarding her requested leave. The Commission found that there were other employees

available in Salt Creek's office to fill in for the various jobs performed by Banyai; that Salt Creek did not reasonably accommodate Banyai's religious practice and did not demonstrate that it would have been an undue hardship on Salt Creek to accommodate her religious practice.

In its conclusions of law, the Commission determined, among other things, that the test to be applied, in ascertaining whether religious discrimination has occurred under the laws of the State of Wyoming, first required Banyai to sustain the burden of demonstrating that her religious convictions were valid or authentic, whereupon the burden then shifted to Salt Creek to show that it had made a reasonable accommodation of Banyai's religious practice without incurring undue hardship in the conduct of its business. The Commission found that Banyai had sustained the initial burden of demonstrating the validity of her religious conviction, but that Salt Creek had not shown that it reasonably accommodated the religious practices of Banyai and had not proved that any such accommodation would have created an undue hardship in the conduct of Salt Creek's business.

The Commission further determined that, as a result of the discriminatory actions of Salt Creek, Banyai should be awarded back wages or actual damages in the amount of $950.40 and attorney's fees in the amount of $850.00, for a total award of $1,800.40.

Salt Creek filed a petition for review of that decision and order, alleging, among other things, that the Commission had erred as a matter of law in not admitting into evidence proceedings instituted by Banyai before the Wyoming Employment Security Commission. The district court remanded the matter back to the Commission for further hearing and directed the Commission to admit the record of these previously excluded proceedings. The second hearing was held before the Commission and an order was entered on March 28, 1977, again holding in favor of Banyai and against Salt Creek. In its second order, the Commission's findings were generally the same as those which emanated from the original

decision and order, except that it related that it had considered the transcript of evidence before the Appeals Examiner of the Employment Security Commission, together with the decision of the Employment Security Commission, and, further, the award of attorney's fees was increased to $2,847.75.

Salt Creek filed a petition for review of the decision, and a district court judgment was entered on January 31, 1978, affirming the second decision and order of the Commission. It is from this judgment that this appeal is taken.

I would have affirmed the judgment in part, reversed in part, and remanded the case for further proceedings.

## FACTS

After Banyai was hired by Salt Creek in January of 1974, she became a member of the Worldwide Church of God. Banyai's employment was satisfactory prior to her dismissal—both from her point of view and from the standpoint of her employer.

When Banyai commenced her employment with Salt Creek, she was furnished with an employee's handbook which outlined the working conditions, the vacation policies, the sick leave, and the leave-of-absence policies. At this time she knew that it was necessary for her to be employed by Salt Creek for a period of one year before becoming eligible to take a one-week's vacation.

The problem between the employer and the employee arose over the fact that Ms. Banyai insisted upon attending, and in the fall of 1974 did attend, a two-weeks' church convocation in California. There is conflict in the evidence on the question of whether or not attendance was mandatory for her from a religious point of view.

Banyai, on September 12, 1974, requested that Salt Creek allow her time off to travel and attend the convocation. This request was denied and she was informed that if she took the leave, which all parties involved recognized would be without pay, then she would be dismissed.

In rejecting Banyai's request, Mr. Klone, Banyai's supervisor, explained that this was the end of the quarter; that 11 employees in that particular department were busy and that it would cause an undue hardship upon the other employees to grant her that leave of absence. The record shows that Banyai would not have accepted anything less than the requested leave of absence.

In view of the manner in which I would have disposed of this appeal, there is no good purpose to be served by going into a detailed review of the testimony pertaining to the accommodation or lack of accommodation that Salt Creek either undertook or failed to undertake in its effort to adjust its business to the religious practice of Banyai. Suffice it to say, there is extensive evidence on both sides pertaining to the question of whether or not Salt Creek could or did adjust to Banyai's demands without causing undue hardship. The Commission, on two occasions, found that (a) Salt Creek had a duty to accommodate the religious practices of Banyai so long as it could do so without undue hardship, and (b) that it did not discharge this duty. Since I would have decided this appeal adverse to Banyai and the Commission on the issue of whether or not the correct burden-of-proof standard was employed by the Commission, the accommodation issue has little relevance.

Appellant argues that the district court erred in the following respects:

"(1) By failing to find that the Wyoming Fair Employment Commission exceeded its statutory authority by applying a burden of proof which is not in conformity with law or with its own Rules of Practice and Procedure.

"(2) By failing to find that the finding of the Commission that Salt Creek failed to reasonably accommodate Banyai's religious practices to the greatest extent possible without incurring undue hardship on its business operations is not supported by substantial evidence and is arbitrary, capricious, and characterized by an abuse of discretion.

"(3) By failing to hold as a matter of law that the decision of The Wyoming Employment Security Commission that Banyai was not discriminated against on account of her religious practices is a bar to relitigation of that issue before the Wyoming Fair Employment Commission under the doctrine of res judicata.

"(4) By failing to hold as a matter of law that the Wyoming Fair Employment Commission exceeded its statutory authority in awarding money damages and attorney's fees in this matter." [From Appellant's brief]

## RES JUDICATA—COLLATERAL ESTOPPEL

Before reaching the burden-of-proof and damages issues, it is appropriate that I address Salt Creek's argument that the entire proceedings before the Commission was barred under the doctrine of res judicata— the point upon which the majority decides this appeal. This position finds its origin in the fact that Banyai had sought and was denied full employment benefits by the Wyoming Employment Security Commission prior to the initial hearing before the Wyoming Fair Employment Commission.

Banyai had filed a claim for unemployment compensation, but a deputy had determined that she was disqualified from receiving any benefits because she had been discharged by Salt Creek for misconduct relating to her work. On appeal to the Employment Security Commission, Banyai appeared without counsel and testified to many of the same matters that were presented to the Fair Employment Commission. The Employment Security Commission reversed the deputy's determination, but found that Banyai had voluntarily left her employment with Salt Creek without good cause and declared, therefore, that Banyai had forfeited ninety percent of her accrued benefit credits. This decision was grounded in a finding that Salt Creek's denial of her request for leave was not arbitrary but was based upon a history of excessive absences, together with the undue burden which her absence would have caused, and that her attendance at the California convocation was not mandatory.

Banyai did not appeal this decision, but chose to pursue the claim before the Wyoming Fair Employment Commission, which claim is now before this court.

In *Roush v. Roush*, Wyo., 589 P.2d 841, 843 (1979), we noted that a final determination is conclusive as to matters adjudicated, or which should have been litigated, in another proceeding involving the same cause of action. The related doctrine of collateral estoppel has a similar effect as to the determination of issues that are identical and necessary for the judgments in the proceedings. It is apparent, as the majority suggest, that we are here concerned with the doctrine of collateral estoppel, since Banyai's claim for unemployment compensation and redress for employment discrimination are not the same.

While the defenses of res judicata and collateral estoppel are usually employed with respect to final judicial decisions, it is now settled, as indicated by the majority, that, in a proper case, these defenses are also applicable to administrative proceedings when the agency has been acting in its quasi-judicial capacity. See, *United States v. Utah Construction and Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). More specifically, these defenses have been applied to one of two agency determinations when the agencies have had parallel jurisdiction over a particular issue. See, *Umberfield v. School District No. 11*, 185 Colo. 165, 522 P.2d 730 (1974); and *Colorado Springs Coach Company v. State Civil Rights Commission*, 35 Colo.App. 378, 536 P.2d 837, U.S. cert. den. 424 U.S. 948, 96 S.Ct. 1420, 47 L.Ed.2d 355 (1975). The last-mentioned decision held that an unemployment compensation decision on the cause of termination of employment barred a subsequent proceeding before a civil rights commission on the issue of employment discrimination. This, of course, is the same situation as is now before this court, but I would have reached a different result.

It is important to realize that when res judicata and collateral estoppel are considered in the administrative context, it becomes imperative that we not only consider the traditional criteria for their application (e. g., identity of claims, parties and causes of action), but also questions of primary jurisdiction and public policy. See, Comment, "Application of Res Judicata to Agencies with Parallel Jurisdiction," 52 Denver L.J. 595, 606 (1975). There is little doubt that, in this case, there are identical parties and issues. The principle question which confronted each agency was the basis for Banyai's termination from employment. The cause for termination was critical for unemployment compensation purposes because it determined the amount of compensation, if any, to which Banyai was entitled. The Employment Security Commission is empowered to declare a partial forfeiture of unemployment benefits if it finds that a claimant voluntarily left his or her work without good cause (§ 27–3–106(a), W.S. 1977) or to declare a complete forfeiture of benefits if it finds the claimant was discharged for misconduct (§ 27–3–106(c), W.S.1977). Likewise, the cause for termination was critical for the Fair Employment Commission purposes because its duty is to determine whether a discharge was based on sex, race, creed, color, natural origin or ancestry. §§ 27–9–104(a)(iii) and 27–9–105(a)(i), W.S.1977. As a result, if I were to end my inquiry upon the finding of identical issues, I would be compelled to concur with the majority opinion as it embraces the decision in *Colorado Springs Coach Company v. State Civil Rights Commission*, supra. I am, however, unable to conclude my inquiry at this point as the majority has been able to do.

The Fair Employment Commission is delegated the express power to receive, investigate and pass on complaints alleging discrimination in employment. § 27–9–104(a)(iii), supra. To make this power meaningful, the Commission is authorized to order an employer to cease and desist from discriminatory employment practices and to take certain affirmative actions. § 27–9–106(g), W.S.1977. The Employment Security Commission, on the other hand, possesses none of these powers. It is responsible for the establishment of public employment offices, for the encouragement

of stable employment and for the provision of benefits to eligible persons. § 27–3–101(a), W.S.1977. In determining eligibility for benefits, the Employment Security Commission must consider the cause for the claimant's unemployment, but this determination is not binding for purposes outside the parameters of the Wyoming Employment Security Law. The Employment Security Law, itself, provides that any "decision as to rights to benefits shall be conclusive *for all the purposes of this act . . .*" [Emphasis supplied]. § 27–3–107(d)(v), W.S.1977.

This distinction in functions provides, for me, the basis for holding that it is the Fair Employment Commission that has been granted the statutory authority to make a final determination of discriminatory employment practices—not the Employment Security Commission. See, Comment, supra, 52 Denver L.J. at 611. To hold otherwise would be to frustrate the broad legislative intent behind the creation of the Fair Employment Commission.

The majority opinion seeks to impose an election of remedies/forum requirement on those alleging a discriminatory discharge from employment. This is premised on the purported unfairness (presumably to an employer) of allowing a complainant to re-litigate the issue of his or her discharge.

This position has been rejected by the United States Supreme Court in what I consider to be a sufficiently analogous situation. In *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court held that an arbitration decision (under a collective bargaining agreement, containing an anti-discrimination clause) holding that the worker had been discharged for cause did not preclude the worker's pursuit of a discrimination complaint with the EEOC. Relevantly, the Court observed:

" . . . [I]n instituting an action under Title VII [before the EEOC], the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process. . . ."

[Bracketed matter supplied] 415 U.S. at 54, 94 S.Ct. at 1022, 39 L.Ed.2d at 161. This observation was made in spite of the fact that the arbitration involved rights similar to, or duplicative of, the rights secured by Title VII. Finally, the Court suggested that the proper way to handle the potentially conflicting decision of the arbitrator is to allow its admission into evidence in the EEOC proceeding, there to be accorded such weight as the Court deems appropriate. 415 U.S. at 60, 94 S.Ct. at 1025, 39 L.Ed.2d at 165.

In Wyoming, an employee is granted two statutory rights—the right to pursue unemployment compensation and the right to pursue a discrimination claim. These rights are, in my judgment, independent of each other. I concede that these statutory proceedings deal with the same basic issue—the reason for discharge or termination. However, the unemployment compensation statutes do not purport to make a binding decision for purposes outside the Employment Security Act—in fact, as I have pointed out, just the opposite is true. The Fair Employment Practices Act expressly granted the Commission authority to determine discrimination claims. Do we not jeopardize or chill a worker's right to seek unemployment benefits if, by so doing, he may thereby affect his ability to pursue a discrimination claim before the body having primary jurisdiction and presumed expertise over such claims? Turning the coin over, do we not significantly undermine the jurisdiction of the Wyoming Fair Employment Commission by holding that an unemployment compensation decision may decide the question of employment discrimination? These are questions which the Colorado cases relied upon by the majority ignore, and which decisions had destructive effect upon the authority of the Colorado Civil Rights Commission. See, Comment, 52 Denver L.J. 595.

Even if I were not satisfied with the dispositive nature of the above discussion (which, incidentally, is not the case), I believe that the holding in *Colorado Springs Coach Company v. State Civil Rights Com-*

*mission,* supra, is erroneous. The *Umberfield* decision, supra, was premised on the express statutory authority which gave the Teacher Tenure Panel authority to consider all statutory and constitutional rights that might have been denied. 522 P.2d at 733. The *Colorado Springs* case ignores this and simply rests on the identical nature of the issues. If the express statutory authority to consider certain issues is critical, then it was probably absent in *Colorado Springs Coach Company v. State Civil Rights Commission* and is certainly absent in Wyoming.

Contrary to the majority, I would have held, therefore, that Banyai was not precluded by the doctrine of collateral estoppel from raising the issue of employment discrimination before the Fair Employment Commission and would, to that extent, have affirmed the district court's judgment. Such a holding would have required consideration of the other issues raised by the appellant. Because these issues are of major import in this state and have not been heretofore decided, and, for the reason that they concern the future conduct of the Fair Employment Commission, I responded to them even though they were not considered by the majority.

### Burden of Proof

The rules of practice and procedure adopted by the Commission and having to do with burden of proof are:

" 'i.   Burden of Proof.

" '(1) Complainant—the complainant, in order to prevail, shall have the burden of making a *prima facie* showing of a discriminatory or unfair employment practice.

" '(2) Respondent—the respondent, in order to prevail, must rebut the complainant's *prima facie* showing of a discriminatory or unfair employment practice.' (Chapter VI, § 8, § i)."
[From Appellant's brief]

The burden-of-proof rule which the Commission applied is:

"The test to be applied by the COMMISSION in determining whether religious discrimination has occurred under the laws of the State of Wyoming consists of two parts: First, the COMPLAINANT has the burden of demonstrating that his or her religious convictions are valid or authentic. Secondly, if the COMPLAINANT successfully demonstrates the validity of conviction, then the burden shifts to the RESPONDENT to show, either that it made a reasonable accommodation of the COMPLAINANT'S religious practice to whatever extent possible without incurring undue hardship in the conduct of RESPONDENT'S business, or that any further accommodation by the RESPONDENT would have created undue hardship in the conduct of its business."
[From the Commission's conclusions of law, ¶ 3.]

The questions, then, become these:

(a) Did the commission have the right to invoke a burden-on-proof standard other than that published by its rules?; and

(b) If it did not, what harm resulted from its action?[1]

I would have held that the Commission exceeded its authority in not applying the burden-of-proof standard set out in its rules, and that this failure was prejudicial to the appellant. Since I would have reversed and remanded on this ground, alleged error having to do with Salt Creek's alleged failure to accommodate Banyai's religious practices would not, therefore, have been considered.

1. Section 27-9-107(g), W.S.1977, provides:

"*Court's decision.*—The court may affirm the decision of the commission or remand the cause for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the commission's findings, inferences, conclusions, or decisions are:

"(i) In violation of constitutional provisions; or

"(ii) In excess of the statutory authority or jurisdiction of the commission; or

"(iii) Made upon unlawful procedure; or

"(iv) Affected by other error of law; or

"(v) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or

"(vi) Arbitrary or capricious."

*The Commission's Right to Require a Proof Burden Other Than That Published by its Rules*

The Commission, instead of utilizing its own published burden-of-proof rules, adopted and applied the statutory burden of proof provided for by the Federal Civil Rights Act of 1964 (42 U.S.C. § 2000a, et seq.). This was done even though the action was brought under Wyoming's Fair Employment Practices Act, supra, and was *not* brought under the Federal Civil Rights Act. Further, it was done notwithstanding there was no Commission rule or statutory authorization extant which would have authorized the Commission to reach outside its own published rules for the purpose of employing a burden-of-proof standard not contained in its rules and upon which rules petitioner-Banyai and respondent-Salt Creek had both a duty and a right to rely.

The legislature had the power to pass the Fair Employment Practices Act unless it can be shown to be repugnant to the Federal or State Constitutions. This is not contended for here. *State v. Irvine*, 14 Wyo. 318, 84 P. 90 (1906). The administrative hearings involved here were contested cases (§ 9–4–101(a)(ii), W.S.1977) under the Wyoming Administrative Procedure Act [§§ 9–4–101 to 9–4–115, W.S.1977]. The burden-of-proof rules adopted by the Commission and in effect at the time of the hearing were defined according to § 9–4–101(a)(vii), which says:

"'Rule' means each agency statement of general applicability that implements, interprets and prescribes law or policy, or describes the organization, procedures, or practice requirements of an agency. . . ."

The rules adopted by the Commission were required by § 9–4–102, W.S.1977, according to the procedures set out in §§ 9–4–103, 9–4–104 and 9–4–105, W.S.1977.

When an agency has adopted rules of practice and procedure under the Wyoming Administrative Procedure Act, it is bound to follow them. *U. S. Steel Corp. v. Environmental Quality*, Wyo., 575 P.2d 749, 752 (1978). In that opinion, we quoted the following two cases in support of the last-mentioned rule. It was said in *Davidson v. Review Board of Indiana Emp. Sec. Div.*, 160 Ind.App. 221, 311 N.E.2d 472, 474 (1974):

"The Review Board has no discretion to disregard its own regulations. *Coleman v. City of Gary* (1942), 220 Ind. 446, 458, 44 N.E.2d 101, 107; *Burnett v. Review Board of Indiana Employment Sec. Div.* (1971), 149 Ind.App. 486, 273 N.E.2d 860; *Sperry Rubber and Plastics Company v. Review Board of Ind. Employment Sec. Div.* (1966), 139 Ind.App. 503, 216 N.E.2d 530. This Court in *Anderson v. Review Board of the Ind. Employment Sec. Div.* (1968), 142 Ind.App. 577, 579, 236 N.E.2d 178, 179, stated:

'. . . Rules and regulations duly adopted by the Employment Security Board have the force and effect of law and failure to follow them makes the decision contrary to law. . . .'

See also, *Steel Transportation Co., Inc. v. Review Board of Ind. Employment Sec. Div.* (1962), 134 Ind.App. 95, 186 N.E.2d 174."

Where a police Civil Service Commission failed to follow its own published rules, the court, in *Coleman v. City of Gary*, supra, said:

"This rule, duly adopted by the commission under the authority of the 1939 Act, had the force and effect of law so long as it was in force. *Wallace v. Dohner*, 1929, 89 Ind.App. 416, 165 N.E. 552; 10 Am.Jur. 925, § 5.

"Although the commission may have the authority at any time to change such a rule, so long as a valid rule of the commission remains in effect it is binding on the commission as well as on the members of the department. To be valid the action of the commission must conform to the rules of the commission which are in effect at the time the action is taken. *Taylor v. McSwain*, 1939, 54 Ariz. 295, 95 P.2d 415."

Here, the agency had rules which had the effect of law and which it failed to follow when it had a duty to do so. What is the

consequence of that? The appellees argue that it is the burden of the appellant to show prejudice on the part of the Commission flowing from its failure to follow its own rules.[2] I would not have so held. For years we had difficulty with agencies not adopting rules as provided by the Administrative Procedure Act. Finally, in *Monahan v. Board of Trustees, Etc., County of Fremont*, Wyo., 486 P.2d 235, 239 (1971), where the school board had failed to adopt rules and then urged that the appellant teacher had the duty to show the prejudice which flowed from this neglect, we said:

"In *Jergeson* [*Jergeson v. Board of Trustees of School District No. 7*, Wyo., 476 P.2d 481] we said it is conceivable that, upon a showing of an agency's failure to adopt rules, the agency would be required to assume the burden of showing an appellant not to have been prejudiced. In view of the questionable and irregular procedures in this case, and in the absence of authority for excusing the agency's failure, we must hold the burden was indeed on the agency to show appellant was not prejudiced.

"The school board failed to meet this burden and the district court should have set aside the board's action. Let us make it clear we do not decide whether there was good cause for terminating Monahan's employment. We hold only that he did not have a fair and impartial hearing."

So, here, where the agency has rules of practice and procedure but, in violation of its obligation to operate thereunder, has utilized other rules which had not been previously adopted or announced, the law must be, as in *Monahan*, that the board must, at the very least, be able to show that this departure did not operate to the prejudice of the appellant. This, I think, the Commission has not done and cannot do in this case.

2. Appellee Banyai says in her brief:
"... Thus, the error, if any, was harmless, W.R.C.P. Rule 61, See Also *Robertson v. State Highway Comm'n*, 450 P.2d 1003 (Wyo.1969). In this regard, prejudice is never presumed and the burden of establishing

The Fair Employment Practices Act made it unlawful to discriminate against a person because of creed. By its adoption of the Federal Civil Rights Act's burden-of-proof standard, the Commission has injected something altogether different from the discrimination contemplated by the Act. The Commission has required the employer not only to tolerate the religious beliefs of the employee once established, but the employer must then go on to accommodate its business to the employee's religious practices. It is one thing to hold an employer to a showing that he did not discriminate against an individual because of religious belief, but quite another to say not only will the employer prove that he did not discriminate against the employee, but he must also prove that he rearranged his business in order to accommodate the religious practices of the individual, even though a hardship is inflicted upon the employer's business—so long as the hardship is not undue.

A case strikingly analogous to the instant matter is *Olin Corporation v. Fair Employment Practices Commission of Illinois*, 34 Ill.App.3d 868, 341 N.E.2d 459, aff'd. 67 Ill.2d 466, 10 Ill.Dec. 501, 367 N.E.2d 1267 (1977). In this case the Illinois law provided that it is an unfair practice

" '(a) For an employer, because of the race, color, religion, national origin or ancestry of an individual to refuse to hire, to segregate, or *otherwise to discriminate against* such individual with respect to hire, selection and training for apprenticeship in any trade or craft, tenure, terms or conditions of employment.' (Emphasis added.) (Ill.Rev.Stat.1967, ch. 48, § 853(a))." 341 N.E.2d at 465.

Title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e–2) provides:

"(a) It shall be unlawful employment practice for an employer—

prejudicial error under fundamental rules of appellate procedure is upon the appealing party. See Also *Tompkins v. Byrtus*, [72 Wyo. 537] 267 P.2d 753 (Wyo.1954) and *Marathon Oil Co. v. Welch*, 379 P.2d 832 (Wyo. 1963)."

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

In *Griggs v. Duke Power Company*, 401 U.S. 424, 431–432, 91 S.Ct. 849, 853–854, 28 L.Ed.2d 158, 164–165 (1971), the Supreme Court said of the 1964 Civil Rights Act, supra:

". . . The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. . . .

\*      \*      \*      \*      \*      \*

". . . Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question."

I see the *Griggs* concept being urged here and accepted by the Commission. It goes like this: Even though Salt Creek's policy may be nondiscriminatory on its face,

". . . the duty not to discriminate on religious grounds includes an additional obligation on the part of the employer to make a good faith effort to accommodate the religious practices of his employees so long as the accommodation does not impose an undue hardship on the employer. . . ." *Olin,,* supra, 341 N.E.2d at 466.

In support of this position, the claimant in *Olin* pointed to the guideline of the fair employment practices commission, which provided in relevant part:

"The Commission believes that the duty not to discriminate on religious grounds, required by Illinois Revised Statutes, Chapter 48, Section 853, Subsection 3(a), includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. . . ." *Olin,* supra, 341 N.E.2d at 466,

and further:

". . . [T]he employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable." *Olin,* supra, 341 N.E.2d at 466.

These Illinois commission guidelines were taken directly from the Guidelines adopted by the Federal Equal Employment Opportunities Commission to aid in the administration of the Federal Civil Rights Act of 1964.

The Appellate Court of Illinois, Fifth District, held in *Olin,* supra, 341 N.E.2d 459, 467–468:

"Notwithstanding the deference which should be accorded the guidelines and interpretive comments of the Commission, it must be remembered that the power to make the laws for this State is a sovereign power vested in the legislature. See, *People v. Tibbitts*, 56 Ill.2d 56, 305 N.E.2d 152. The Act only made it unlawful 'to refuse to hire, to segregate, or otherwise discriminate against' an individual because of '[his] race, color, religion, national origin or ancestry.' (Ill. Rev.Stat.1967, ch. 48, par. 853(a).) *By their guidelines, the Commission injected something new and entirely different from discrimination as contemplated by the drafters of the statute. It has required employers not only to tolerate the religious beliefs but also accommodate all*

*of the religious practices of their employees, no matter what they are, even though a hardship is inflicted upon the employer, so long as it is not an undue hardship. We find no statutory authority to warrant such treatment of employers.*" [Emphasis supplied]

See, also, *Reid v. Memphis Publishing Co.,* 6 Cir., 521 F.2d 512 (1975).

Had I been writing for the majority, I would not have felt called upon to go as far as the court did in *Olin,* supra. The Illinois court held that the commission's adoption of a guideline which was identical to the guide for interpreting the Civil Rights Act of 1964 exceeded the commission's statutory authority. Here, the Wyoming Commission had not previously adopted the Federal guidelines as its rule. Instead, it utilized the Federal rule *in violation of its duty under the Administrative Procedure Act to use its own published rule.*

Based upon the above, there is no need for me to go through the evidence to decide whether the discrimination features of the statute and the applicable Commission rule have been violated. The position of the appellees is that Salt Creek's discrimination came about through its refusal to accommodate the religious practices of Banyai. I would have held that Salt Creek—under the statute and rules of the Wyoming Fair Employment Commission in force and effect at the time when the hearings were held in this case—had a duty not to discriminate against Banyai because of her religion, but this duty did not extend so far as to require Salt Creek to adjust its business policy to the religious practices of Ms. Banyai.

### Money Damages and Attorney's Fees

It follows from what I would have held on the burden-of-proof issue, I would, therefore, have held that there can be no damages award. Furthermore, it would have been my judgment that it was error for the Commission and the district court to order an award of Banyai's attorney's fees. The Wyoming Fair Employment Commission decision once again relies upon Federal authority which allows the recovery of at-torney's fees under the Federal Civil Rights Act. This, neither the Commission nor the court had authority to do or approve.

The general rule with regard to a recovery of attorney's fees by the prevailing party is stated in 25 C.J.S. Damages § 50, p. 777:

"Generally, there can no recovery as damages of the expenses of litigation and attorney fees unless authorized by statute or contract."

This court has adopted the general rule in *Werner v. American Surety Company of New York,* Wyo., 423 P.2d 86, 88 (1967), when we said:

". . . Generally speaking, attorney fees are not recoverable unless there is specific statutory authority therefor, or unless such are provided for by contract. . . ."

We also said, at page 89 of that opinion:

"In the absence of statutes or decisions in Wyoming allowing attorney fees to be charged in cases of this kind, we see no reason for deviation from the ordinary rule that attorney fees are not recoverable unless provided for by contract or authorized by statute. . . ."

No contract is involved in the present case, and the Fair Employment Practices Act of Wyoming does not make provision for the recovery of attorney's fees by the prevailing party, nor do the rules and regulations promulgated by the Commission under this Act.

Had I been writing for the majority, I would have affirmed in part, reversed in part, and remanded for further proceedings utilizing the proper burden-of-proof standard.